## PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

Name **Hart**                           **David**                     **B.**
       (Last)                            (First)                      (Initial)

Prison Number  **C70436**          E-filing

Institutional Address  **P.O. Box 689, Soledad, CA 93960-0689**

====================================================================

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

**David Bryan Hart**                      )
(Enter the full name of plaintiff in this action.)   )          CV 08       1498
                                          )
                vs.                       )
                                          )      Case No.
                                          )      (To be provided by the Clerk of the Court)   MHP
**B. Curry, Warden (A)**                  )
                                          )      **PETITION FOR A WRIT**
**A. Schwarzenegger, Governor**           )      **OF HABEAS CORPUS**
                                          )
                                          )                        (PR)
                                          )
(Enter the full name of respondent(s) or jailor in this action)   )

====================================================================

### Read Comments Carefully Before Filling In

### When and Where to File

        You should file in the Northern District if you were convicted and sentenced in one of these

counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa,

San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma.  You should also file in

this district if you are challenging the manner in which your sentence is being executed, such as the

loss of good time credits, and you are confined in one of these counties.  Habeas L.R. 2254-3(a).

        If you are challenging your conviction or sentence and you were not convicted and sentenced in

one of the above-named fifteen counties, your petition will likely be transferred to the United States

District Court for the district in which the state court that convicted and sentenced you is located.  If

you are challenging the execution of your sentence and you are not in prison in one of these counties,

your petition will likely be transferred to the district court for the district that includes the institution in

which you are confined.  Habeas L.R. 2254-3(b).

PET. FOR WRIT OF HAB. CORPUS                    - 1 -

Who to Name as Respondent

You must name the person in whose actual custody you are.  This usually means the Warden or jailor.  Do not name the State of California, a city, a county or the superior court of the county in which you are imprisoned or by whom you were convicted and sentenced.  These are not proper respondents.

If you are not presently in custody pursuant to the state judgement against which you seek relief but may be subject to such custody in the future (e.g. detainers), you must name the person in whose custody you are now <u>and</u> the Attorney General of the state in which the judgement you seek to attack was entered.

A.  INFORMATION ABOUT YOUR CONVICTION AND SENTENCE

1.  What sentence are you challenging in this petition

    (a)   Name and location of court that imposed sentence (for example, Alameda County Superior Court, Oakland):

| **Fresno County Superior Court** | **Fresno, CA** |
|---|---|
| (Court) | (Location) |

(b) Case number, if known    **288486-4**

(c) Date and terms of sentence    **July 22, 1983** , 17 to Life

(d) Are you now in custody serving this time?  (Custody meaning being in jail, on parole or probation, etc.)                Yes  **X**        No _____

Where?

Name of institution:    **Correctional Training Facility**

Address:    **P.O. Box 686, Soledad, CA 93960-0686**

2. For what crime were you given this sentence?  (If your petition challenges a sentence for more than one crime, list each crime separately using Penal Code numbers if known.  If you are challenging more than one sentence, you should file a different petition for each sentence.)

**Penal Code § 187, second-degree murder**.

**Penal Code § 12022.5, use of fire-arm**.

_____

1    3. Did you have any of the following?

2        Arraignment:                          Yes __X__        No _____

3        Preliminary Hearing:                  Yes __X__        No _____

4        Motion to Suppress:                   Yes __X__        No _____

5    4. How did you plead?

6        Guilty_____    Not Guilty __X__    Nolo Contendere _____

7        Any other plea (specify) _____

8    5. If you went to trial, what kind of trial did you have?

9        Jury __X__        Judge alone _____    Judge alone on transcript _____

10   6. Did you testify at your trial?              Yes _X__        No _____

11   7. Did you have an attorney at the following proceedings:

12       (a)    Arraignment                   Yes __X__        No _____

13       (b)    Preliminary hearing           Yes __X__        No _____

14       (c)    Time of plea                  Yes _____        No _____

15       (d)    Trial                         Yes __X__        No _____

16       (e)    Sentencing                    Yes __X__        No _____

17       (f)    Appeal                        Yes _X__          No _____

18       (g)    Other post-conviction proceeding    Yes _X__    No _____

19   8. Did you appeal your conviction?            Yes _X__        No _____

20       (a)    If you did, to what court(s) did you appeal?

21              Court of Appeal               Yes _X__          No _____

22              Year: 1983        Result: Denied _____

23              Supreme Court of California   Yes _____        No _X__

24              Any other court               Yes _____        No _X__

25

26       (b)    If you appealed, were the grounds the same as those you are raising in this

27

28

| | | Petition? **Different issue** | Yes _____ | No $\times$ |

1
2
3
4
5
6
7

Petition? **Different issue**          Yes _____          No $\times$

Was there an opinion?          Yes $\times$          No _____

(c)   Did you seek permission to file a late appeal under Rule 31(a)?

Yes _____          No $\times$

If you did, give the name of the court and the result:

_____

_____

9. Other than appeals, have you previously filed any petitions, application or motions with respect to this conviction in any court, state of federal?          Yes _____          No **X**

[Note; if you previously filed a petition for a writ of habeas corpus in federal court that challenged the same conviction you are challenging now and if that petition was denied or dismissed with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit for an order authorizing the district court to consider this petition. You may not file a second or subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit. 28 U.S.C. §§ 2244(b).]

(a)   If you sought relief in any proceeding other than an appeal, answer the following questions for each proceeding. Attach extra paper if you need more space.

I.   Name of Court: **Fresno County Superior Court** _____

Type of Proceeding: **Writ of Habeas Corpus** _____

Grounds raised (Be brief but specific):
a. **Immutable facts of the crime do not support finding Petitioner currently poses an unreasonable risk to public safety, if released.**
**X.** _____

b. **No other facts reliably support parole denial.** _____

**X** _____

Result: **Denied** _____ Date of Result: **09/24/07** _____

II.   Name of Court: **Appellate Court** _____

Type of Proceeding: **Writ of habeas corpus** _____

Grounds raised (Be brief but specific):

1    a. **Same as Superior Court**. _____

2    b._____

3    c._____

4    d._____

5    Result: **Denied** _____ Date of Result: **11/09/07** ____

6    III.    Name of Court: **Calif. Supreme Court** _____

7    Type of Proceeding: **Petition For Review** _____

8    Grounds raised (Be brief but specific):

9    a. **Same as Superior Court** _____

10    b._____

11    c._____

12    d._____

13    Result: **Denied** _____ Date of Result: **01/23/08** ____

14    IV.    Name of Court: _____

15    Type of Proceeding: _____

16    Grounds raised (Be brief but specific):

17    a._____

18    b._____

19    c._____

20    d._____

21    Result: _____ Date of Result: _____

22    (b)    Is any petition, appeal or other post-conviction proceeding now pending in any court?

23    Yes _____    No _**X**___

24    Name and location of court: _____

25    B. GROUNDS FOR RELIEF

26    State briefly every reason that you believe you are being confined unlawfully.  Give facts to

27    support each claim.  For example, what right or privilege were you denied?  What happened?  Who

28    made the error?  Avoid legal arguments with numerous case citations.  Attached extra paper if you

PET. FOR WRIT OF HAB. CORPUS    - 5 -

1    need more space. Answer the same questions for each claim.

2          [Note: You must present ALL your claims in your first federal habeas petition. Subsequent

3    petitions may be dismissed without review on the merits. 28 U.S.C. §§ 2244(b); **McCleaskey v. Zant**,

4    499 U.S. 467, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).]

          Claim One: **No reliable or relevant evidence, offense or otherwise, supports finding
5    Petitioner would currently pose an unreasonable risk to public safety, if released,
     compelling his release onto parole**.

6          Supporting Facts: **Petitioner, who has an exemplary prison record an no prior**

7          **Criminal, seeks relief from Governor's reversal of his second grant of parole,**

8          **23½ years after he committed his second-degree murder conviction crime.**

9          **(Continued on page 8.)**

10         Claim Two: **N/A**

11

12         Supporting Facts: _____

13

14

15

16         Claim Three: **N/A**

17

18         Supporting Facts: _____

19

20

21

22         If any of these grounds were not previously presented to any other court, state briefly which

23    grounds were not presented and why:

24         **N/A**

25

26

27

28

PET. FOR WRIT OF HAB. CORPUS                    - 6 -

1       List, by name and citation only, any cases that you think are close factually to yours so that
2  they are an example of the error you believe occurred in your case.  Do not discuss the holding or
3  reasoning of these cases:
4  **See supporting facts and Memorandum of Points and Authorities.  Also see**
5  **Hayward v. Marshall (9th Cir. 2008) __F.3d__, 2008 U.S. App. Lexus 40.**
6
7  Do you have an attorney for this petition?         Yes _____     No **X**
8  If you do, give the name and address of your attorney:
9
10       WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled
11  in this proceeding.  I verify under the penalty of perjury that the foregoing is true and correct.
12
13  Executed on  3-12-08
14          Date             Signature of Petitioner

1

## INTRODUCTION

2   On August 17, 2006, Petitioner appeared before the Board of Parole Hearings (Board) for the

3   ninth time, and for the second time was granted parole. (Exhibit A.) Relying solely on the arguably

4   immutable facts of the twenty-three and one-half old second-degree murder conviction crime in this

5   matter, on January 10, 2007, the Governor reversed Petitioner's parole grant. (Exhibit D.) Petitioner

6   timely appealed that parole reversal to, and through, the State Courts. On September 24, 2007, the

7   State Superior Court issued the only reasoned decision, in this matter, denying relief, also based

8   solely on a rendition of the facts of the crime in this matter. (See Exhibit H.) As only one judge voted

9   to hear the matter, the State Appellate Court summarily denied the writ on November 9, 2007.

10  (Exhibit G.) Subsequent to Petitioner's filing of a Petition for Review, the State Supreme Court

11  summarily denied relief on January 23, 2008. (Exhibit F.) After having timely exhausted his state

12  remedies, Petitioner files this writ seeking relief in this Court.

13

## THE OFFENSE

14  1. Petitioner, unequivocally admits and accepts responsibility for the 1982 murder of Michael

15  Imperatrice, which resulted in his being convicted of second-degree murder and receiving a 17 years

16  to life sentence. Almost twenty-six years ago, in mid-1982 Petitioner and his girlfriend of one and a

17  half (1½) years had broken up after she began dating the victim. Extremely angry, Petitioner, who

18  had a weapon he had taken from his home, decided to confront his former girlfriend's new boyfriend

19  and force him, at the point of a gun, to stop seeing her. After determining that the victim was at her

20  house, he went there and hid in the back of the victim's SUV type truck, which was parked next to

21  his former girlfriend's home. After the victim entered the truck and drove a short distance, Petitioner

22  appeared. The two argued as the victim drove. When the victim stopped the vehicle and ordered him

23  to leave, Petitioner panicked and shot the victim three times in the head. He then drove the vehicle to

24  the area of a local canal, where he subsequently abandoned it after placing the victim's body in the

25  canal. A situational murder, wherein "there is [not only] no evidence the victim suffered at all," as

26  Petitioner's attorney noted in his Petition for Review, pp. 14-15, it is an unfortunately common

27  occurrence. A situational type second-degree murder whose nature and number of shots was

28  addressed by the state court in In re Ernest Smith (2003) 114 Cal.App.4th 343, wherein the court

1   found these specific crime factors involving multiple gunshots to the head, constitute a crime that was

2   not carried out in a manner demonstrating a Cal. Code Regs., tit. 15, § 2403(c)(1)(D) especially

3   callous disregard for human suffering.  (Id. at 365-366.)

4          2. A crime whose facts the Board reviewed along with the Petitioner's life performance

5   record, both prior to and subsequent to his conviction, after which they decided for the second time to

6   grant Petitioner parole.  He received his first grant of parole at his 1996 parole hearing at which the

7   Board determined for the facts of Petitioner's offense, after good time credits reduction required a

8   sixteen year term, or 21 years before credit reduction, and a release in 1998.  (Exhibit D.)  On January

9   10, 2007, the Governor acted to reverse the Board's second grant of parole, providing as his sole

10  reasoning for that reversal that the immutable factors of Petitioner's crime require a prison term

11  longer than the 23½ years he had then served.  Specifically the Governor stated:

12          "[T]he second-degree murder for which [Petitioner] was convicted was
            especially heinous considering the level of premeditation involved…[His]
13          actions also demonstrated an exceptionally callous disregard for [the
            victim's] suffering…is alone sufficient for me to conclude presently that
14          his release would pose an unreasonable public safety risk….
            Given the current record before me…I find that the gravity of the murder
15          perpetrated by [Petitioner] presently out weighs the positive factors.
            (Exhibit 5.)
16

17          3. Somewhat elaborating beyond the crime factors stated by the Governor, the State Superior

18  Court (acting in an unreasonable manner) concluded [twenty-three and one-half years after the crime

19  was committed] that, "The premeditated and vicious nature of the crime is some evidence, in itself, to

20  support the Governor's decision to reverse the Board's grant of parole."  (Exhibit H, p. 3.)  The State

21  Superior Court, on p. 1 of its decision also noted, "The primary, if not the only, justification for the

22  Governor's reversal appears to be the nature of the offense."  (Id., p. 1:24-26.)

23          4. Accordingly, the factual question before this court is did the Governor unreasonably act in

24  excess of his discretionary authority by deciding to deny parole based solely on the facts of a 23½

25  year old crime, without clearly establishing the required nexus showing how decades old acts provide

26  a basis for predicting a prisoner would currently pose an unreasonable risk to public safety, if released,

27  especially given Petitioner's exemplary post-conviction performance record, and his lack of a prior

28  criminal record.  A federal standard now required by the decision in Hayward v. Marshall (9th Cir.

1    2008) ___F.3d ___, 2008 U.S. App. Lexis 40 at *17-*19, relying on and adapting for federal purposes

2    the holdings of In re Lee (2006) 143 Cal.App.4th 1400, 1408 [review denied]; In re Scott (2003) 133

3    Cal.App.4th 573, 595 [review denied]; and In re Elkins (2006) 144 Cal.App.4th 475, 499 requiring

4    evidence not only of the presence of a state regulatory law factor possibly justifying parole denial, but

5    also a demonstration that proof of that factor demonstrates a prisoner currently poses an unreasonable

6    risk to public safety, if released. Proof which the relied upon cases hold cannot be solely provided by

7    20+ year old evidence, given a long term, exemplary, post-imprisonment record. And, in fact, in this

8    case, a review of the record will show that after 23½ years the offense cannot be reliably relied upon

9    to predict Petitioner's future behavior. Therefore, in accordance with the standards of Lee, Scott, and

10   Elkins, the decision by the Governor and the state courts were unreasonable. (Hayward, Ibid.)

11                                  NON-OFFENSE FACTORS

12   5. All the parties reviewing this matter, including the Governor, recognize that Petitioner had

13   no prior criminal record, had a stable social history, and has a highly positive, parole supportable post-

14   conviction record. Significant because how a prisoner lived his life, both before and after

15   imprisonment, determines the limitations that are to be placed on the reliability of offense facts as a

16   tool predicting/ forecasting future negative acts by a prisoner twenty or more years after his crime of

17   conviction occurred. (See In re Lee, supra, 143 Cal.App.4th at 1408, 1412-1413, identifying the role

18   played by a prison record, with a long term over-all positive nature, in limiting the use of 20+ year-old

19   crime facts.)

20   5a. As the Board found (Exhibit A, p. 3), and the Governor agreed (Exhibit E), Petitioner had

21   a stable social history with no prior criminal record. In fact, at the time of the crime he was working

22   as a manager of an ice cream shop (Exhibit A, p. 17) and attending college in the evening (Id. at 39).

23   5b. An education Petitioner continued pursuing while in prison, enabling him to earn an AA

24   degree and proceed well on the way to earning a BA degree in accounting. (Id at 41.) A degree

25   which he plans to complete upon release (Id. at 13) and a field in which he plans on working.

26   5c. While in prison, Petitioner received only one CDC 115, twenty-two years ago on January

27   27, 1986, for possession of marijuana, and one CDC 128 that same year. (Exhibit A, p. 27.) In

28   addition, he has a lengthy record of participation in self-help groups, including AA/NA, the Impact

                                              10

1  for Recovery, Creative Conflict Resolution, the Cat. T and Cat. X programs, Breaking Barriers, etc.

2  All of which were recognized by the Board (Exhibit A, p. 27) and the Governor (Exhibit E).

3      5d. Both the Board and the Governor recognized that Petitioner has maintained "solid

4  relationships and close ties with supportive family [members] and friends." (Exhibit A, pp. 12, 13-19,

5  Exhibit E.) Ties which the Board (Exhibit A, p. 19) and the Governor (Exhibit E) recognize has

6  resulted in his having "appropriate parole plans." Parole plans which include residency, a firm job

7  offer, and other support. (Exhibit A, pp. 16-20.)

8      5e. Both the Board and Governor recognized that the psychological evaluations of Petitioner

9  prepared for the Board support his release. (Exhibit A, pp. 22-24, Exhibit C, Exhibit E.)

10  Psychological evaluations whose contents note that, "if released into the community [Petitioner's] risk

11  is also minimal" (Exhibit A, pp. 22-23) and his "[p]otential for violence, if released, is well below

12  average as there are no precursors to violence that the doctor could see." (Id. at 8.)

13  DECISIONAL FACTORS

14      6. The question before this court is not the comparative weight to give the considered evidence

15  for and (if any) against parole. Determining the comparative weight of evidence is currently the

16  domain of the parole authority. Instead, the question is, given Petitioner's post-offense exemplary

17  prison record, did the immutable nature of the twenty-three and one-half year old crime in this matter

18  provide any [some] reliable and relevant evidence, on January 10, 2007, supporting the Governor's

19  decision to deny parole, in accordance with the standards of evidence established by the governing state

20  and federal case decision law? (See Hayard v. Marshall, supra, ___F3d.___, 2008 U.S. App. Lexis 40,

21  "'The test determining the reliability of the evidence is not whether some evidence supports the reasons

22  the Governor cites for denying parole, but whether some evidence indicates a parolee's release

23  endangers public safety.' (In re Lee, (2006) 143 Cal.App.4th 1400, 1408; In re Scott, 133 Cal.App.4th

24  573, 595.)" (Hayward, Id., at *17-*19.)

25      7. As in Hayward, after 23½ (now 25+) years, the nature of Petitioner's crime no longer

26  provides some relevant or reliable evidence supporting a parole denial decision.

27      8. Petitioner has a state and federally protected liberty interest in parole requiring the court's

28  determine if his due process as defined by Hayward has been violated.

9. The twenty-three and one-half (23½) years of this Petitioner's incarceration as of January 10, 2007, was six and one-half years more than that required to satisfy <u>Irons v. Carey</u> (9th Cir. 2007) 505 Fed.3d 846, 853, "minimum number of years required by his sentence." Accordingly, Petitioner's due process was violated when he was deemed unsuitable for parole by the Governor, despite his record giving a clear appearance of his rehabilitation. (<u>Id</u>. at 854.)

PRAYER

WHEREFORE, Petitioner prays this Court:

1. Issue an Order to Show Cause instructing the parties respond as to whether sole reliance on his crime factors is a sufficient basis on which to deny parole to this Petitioner, given 23½ years since the commitment offense and the positive nature of his post-conviction record, under the standards of <u>Hayward v. Marshall</u>, <u>supra</u>, ____F.3d___; and,

2. If such denial is found, unsupported, order Petitioner's immediate release.

Dated: March __12__, 2008

Respectfully submitted,

David Hart
Petitioner, In pro per

12

1

MEMORANDUM OF POINTS AND AUTHORITIES

2

I.   CALIFORNIA LAW CREATES A FEDERALLY
PROTECTED LIBERTY INTEREST IN PAROLE

3

RELEASE.

4

As the state and federal courts have repeatedly found, and the now well-settled law of this

5

Circuit holds, California's Penal Code section 3041 and its accompanying parole system provides the

6

state's prisoners with a federally protected liberty interest in parole release.  See Sass v. California

7

Board of Prison Terms, 461 F.3d 1123, 1127; Biggs v. Terhune, 334 F.3d 910, 914-915; McQuillion v.

8

Duncan, 306 F.3d 895, 901; and Irons v. Carey, 505 F.3d 846.

9

II.   DUE PROCESS FOR CALIFORNIA'S INDETERMINATELY
SENTENCED PRISONER'S REQUIRES MORE THAN A

10

PAROLE HEARING AND ACCOMPANYING STATEMENT
OF REASONS FOR THE DENIAL DECISION.

11

California Law underlying the liberty interest of an indeterminately sentenced prisoner requires

12

the statement of reasons for parole denial rest on some reliable and relevant evidence demonstrating

13

that if released, the prisoner would currently pose an unreasonable threat to public safety.  Absent that

14

factual proof, the parole applicant must be released, regardless of post-eligibility time served.  See In re

15

Hayward v. Marshall, supra, 2008 U.S. App. Lexis 40 at *17-*19, explaining that California courts

16

have made it clear that the findings that are necessary to deem a prisoner unsuitable for parole [under

17

Irons, 505 F.3d at 851] are not that a particular factor or factors indicating unsuitability exist, but that

18

the release of a prisoner would subject society to an 'unreasonable risk' of danger to public safety.[1]  A

19

finding relying on In re Lee (2006) 143 Cal.App.4th 1400, 1408 [Review denied], holding, "The test is

20

whether some evidence supports the reasons the [Board] cites for denying parole, but whether some

21

evidence indicates a parolee's release unreasonably endangers public safety."  A holding of In re Lee at

22

1408 now adopted as the federal standard for the purpose of evaluating the due process status of a

23

parole unsuitability decision by the Board in Hayward v. Marshall (9th Cir. 2008), 2008 U.S. App.

24

_____

25

[1] The State Supreme Court granted review in In re Lawrence, Case No. S154018, on September 19, 2007, to answer the

26

questions, "[T]o what extent should the Board of Parole Hearings, under Penal Code section 3041...consider the prisoner's
current dangerousness and at what point, if any, is the gravity of the commitment offense and prior criminality insufficient

27

to deny parole when prisoner appears otherwise rehabilitated."  However, the State Supreme Court also lifted the stay and
released petitioner Lawrence.  Further, the State Supreme Court has granted review, or an O.S.C., and returned cases to
lower courts, instructing they determine why that petitioner remains a danger to public safety, citing In re Lee (2006) 143

28

Cal.App.4th 1400, 1408, in those orders.  See In re Ronald Singler, (2007) DJDAR 850, Case No. S150139; In re
Masoner (2007) DJDAR 12436, Case No. S144097.

Lexis 40, *17-*18. Petitioner Lee was convicted of both a second-degree murder and a premeditated attempted murder. Crimes by definition more serious than Petitioner's. Further, at the time of Lee's hearing only 17 years since the crime had passed versus 23½ for Petitioner. Lee also had one CDC-115 while in prison, and like Petitioner, an otherwise exemplary prison record. Similar situational factors except petitioner Lee was released on parole.

Lee is a comparative case with Petitioner's matter. In Lee the underlying causal act of his pled to second-degree murder and attempted premeditated murder was his situational anger over the refusal of the buyer of his business to make the owed installment payments. He appealed when after 17 years, the Governor reversed his [first]parole grant. Lee's initial appeal was summarily denied by the State Superior and Appellate Courts. Granting review, the State Supreme Court returned the matter to the Appellate Court, which subsequently granted the writ. The state appealed that decision to grant the writ to their Supreme Court, which denied review, thereby upholding the Appellate Court decision.

The standard required of California requires that a parole unsuitability decision be supported by some evidence showing a prisoner currently poses a threat to public safety, if released. (Hayward, Ibid.) Evidence not present in this case. Further, to be denied parole, a prisoner with a positive prison record must have served less than the minimum years required for their sentence. Irons, supra, at 856; Hayward, supra, at *30-*31. Petitioner has served far more than the minimum years required for his sentence.

> III.  DECISIONS OF THE NINTH CIRCUIT ARE BINDING
> AUTHORITY CONCERNING CONSIDERATION OF
> PAROLE SUITABILITY MATTERS

In Hart v. Massanari 226 F.3d 1155 (9th Cir. 2002) the Ninth Circuit addressed this specific issue and delineated in detail when, and whether or not, a decision by a three-judge panel binds both other circuit panels and its encompassing district courts. In sum, Hart held that circuit law is binding authority for other courts within a particular circuit, including the Court of Appeals itself, thus the panel which considers an issue sets the law not only for the inferior courts, but also for future panels of the court, unless the resolution is overturned by the court itself sitting en banc, by the Supreme Court, or if Congress changes the law.

Relying on Irons v. Warden 505 F.3d at 846 and state court decisions in In re Lee (2006) 143

1  Cal.App.4th 1400, 1408 [Reviewed Denied]; In re Scott (2005) 133 Cal.App.4th 573, 595 {Review

2  Denied] and In re Elkins (2006) 144 Cal.App.4th 475, 499; the Ninth Circuit in Hayward v. Marshall,

3  supra, at *17-*19 held that:

4      "Even though [Cal. Code Regs., tit. 15, § 2402(c) and (d) suitability and
       unsuitability factors are helpful in analyzing whether a prisoner should be
5      granted parole, California courts have made clear that the 'findings that are
       necessary to deem a prisoner unsuitable for parole,' Irons, 505 F.3d at 851,
6      2007 WL 2927359, at *3, are not that a particular factor or factors
       indicating unsuitability exist, but that a prisoner's release will unreasonably
7      endanger public safety. In re Dannenberg 156 Cal.App.4th 1387, 2007 WL
       2408290, at *9, In re Lee 143 Cal.App.4th 1400, 1408, In re Scott 133
8      Cal.App.4th 573, 595. For our purposes then '[t]he test is whether some
       evidence supports the reasons the [parole authority] cites for denying
9      parole, but whether some evidence indicates a parolee's release
       unreasonably endangers public safety. Some evidence of the existence of a
10     particular factor does not necessarily equate to some evidence the parolee's
       release unreasonably endangers public safety. Lee 143 Cal.App.4th at
11     1408; In re Elkins 144 Cal.App.4th 475, 499…'"

12     The Hayward court then noted that while some evidence could support reversal relying on

13  Hayward's criminal history, his gang involvement, and the nature of his commitment offense, that

14  "indefinite detention based solely on an inmate's commitment offense, regardless of the extent of his

15  rehabilitation, will at some point violate due process, given the liberty interest that flows from relevant

16  California parole statutes. Irons 505 F.3d at 854, 'The commitment offense can negate suitability only

17  if the circumstances of the crime reliably established by some evidence in the record rationally

18  indicate the offender will present an unreasonable public safety risk if released fro prison.' Scott 133

19  Cal.App.4th at 595." The Hayward court noted after a lengthy period, a relatively minor criminal

20  history does not rise to the level of some evidence. A factor not relied on by this Board in this case.

21  (Hayward at *24-*25.) The Hayward court also noted petitioner's "gang activity both inside and

22  outside of prison," and his drug usage in his early prison years and found they did not rise to the level

23  of some evidence he has been involved in any such gang activities since the 1980's. (Id. at *25.)

24     Finally, the court addressed Hayward's commitment offense and noted that due to the overall

25  "circumstances of [his] case, including Hayward's rehabilitation by education and conduct while

26  imprisoned, …[his]commitment offense, which occurred 25 years ago cannot demonstrate that [his]

27  release would pose an imminent danger to public safety [relying on] Rosenkrantz v. Marshall 444

28  F.Supp.2d 1063, 1084 (C.D. Cal. 2006)." Rosenkrantz, as cited in Hayward, notes that after nearly

15

1   "two decades" of incarceration "relying upon petitioner's crime as an indicator of his dangerousness
2   may [have] been reasonable," after this period of time, it is not reasonable and "violates due process
3   because petitioner's commitment offense has become such an unreliable predictor of his present and
4   future dangerousness that it does not satisfy the 'some evidence' standard. After nearly twenty years
5   of rehabilitation [as in this case] the ability to predict a prisoner's future dangerousness based simply
6   on the circumstances of his or her crime is nil. Scott 133 Cal.App.4th at 595." (Hayward, Id. at *25-
7   *27.)

8       Given Petitioner's record of educational, vocational, and other rehabilitative programming,
9   under the Ninth Circuit's Hayward standard, his 1982 crime factors no longer can reliably be used to
10  predict his future behavior, and their use in that manner by the Board and Respondent now violate due
11  process.

12              IV.  THE STATE COURT'S DE FACTO CONCLUSION THAT
                    SOME EVIDENCE OF A RELIABLE AND RELEVANT
13                  NATURE SUPPORTED THE GOVERNOR'S DECISION
                    TO DENY PETITIONER PAROLE WAS CONTRARY TO
14                  FACT AND LAW, THEREFORE AN UNREASONABLE
                    APPLICATION OF CLEARLY ESTABLISHED FEDERAL
15                  LAW AS DETERMINED BY THE SUPREME COURT.
16

17      "Under California law the Governor, in considering whether to reverse a grant of parole by the
18  Board, must consider the same factors the Board is required to consider. [Citation.] Accordingly,
19  [court's] review the Governor's decision to reverse a parole grant under the same procedural due
20  process principles [used] to review challenges to the Board's denial of parole." (Hayward v. Marshall,
21  supra, 2008 U.S. App. LEXIS 40, *14.) Therefore, as "the Supreme Court ha[s] clearly
22  established[,]…a parole board's decision deprives a prisoner of due process with respect to his interest
23  if the Board's decision is not supported by some evidence in the record or is otherwise arbitrary. Irons
24  v. Carey 505 F.3d 846 at 851, (quoting Hill 472 U.S. at 457; Sass 461 F.3d at 1128-29)." (Hayward
25  Id. at *14.) A "some evidence…analysis framed by the statutes and regulations governing parole
26  suitability determinations in the relevant state. (Irons, Id.) Accordingly, [this court][must] look to
27  California law to determine the findings that are necessary to deem a prisoner unsuitable for parole.
28  Then [it] review[s] the record in order to determine whether the State court decision holding that the

1  findings were supported by 'some evidence' constituted an unreasonable application of the 'some

2  evidence' standard articulated in <u>Hill</u>." (<u>Hayward</u> at *15.)

3          Under California law, prisoners may be found unsuitable for parole only if the evidence

4  rationally shows the inmate will pose an unreasonable risk of danger to society if released from

5  prison. (Penal Code § 3041; Cal. Code Regs., tit. 15 § 2402(a).) The Board makes that decision by

6  applying the factors it has set forth in its regulations, § 2402(c), subd. (1) through (6) and 2402(d),

7  subd. (7) through (8). When making a decision to reverse, i.e. deny parole, the Governor is required

8  by law to consider the same factors as the Board. (<u>Rosenkrantz</u>, 24 Cal.4th 616.) However, "[e]ven

9  though the [§2403] suitability and unsuitability factors are helpful in analyzing whether a prisoner

10 should be granted parole, California courts have made clear that the 'findings that are necessary to

11 deem a prisoner unsuitable for parole' (<u>Irons</u>, 505 F.3d at 851) are not that a particular factor or

12 factors indicating unsuitability exist, but that a prisoner's release will unreasonably endanger public

13 safety. <u>In re Dannenberg</u> (2007) 153 Cal.App.4th 1387; <u>In re Lee</u> 143 Cal.App.4th at 1408; <u>In re

14 Scott</u> 133 Cal.App.4th 573, 595. [Therefore,] 'The test is not whether some evidence supports the

15 reasons the Governor cites for denying parole, but whether some evidence indicates a parolee's

16 release endangers public safety.' <u>Lee</u>, 143 Cal.App.4th at 1408. See also <u>In re Elkins</u> (2006) 144

17 Cal.App.4th 475, 499, holding that the 'Governor in reviewing a suitability determination must remain

18 focused…on facts indicating that release currently poses 'an unreasonable risk of danger to society'

19 (Cal. Code Regs., tit. 15 § 2402(a). <u>Scott</u>, 133 App.4th at 591 ('The factor statutorily required to be

20 considered, and the overarching consideration is 'public safety.' (Citing Cal. Penal Code § 3041(b))."

21 (<u>Hayward</u>, <u>supra</u>, at *17-*19.)

22          A careful review of the record in this case will demonstrate that in the State's only reasoned

23 decision, the Superior Court unreasonably applied the some evidence when it concluded that the

24 Governor's reversal of Petitioner's parole grant (based only on his 23½ year old crime factor) was

25 justified, as no evidence in the record supports a determination that Petitioner's release would

26 unreasonably endanger public safety. As in the <u>Hayward</u> case, Petitioner's crime was committed

27 decades ago – in 1982. The unfortunate confrontation in this case, resulting in the killing of the

28 victim, resulted from jealousy and anger, and similar (to the event in <u>Hayward</u>) it is unlikely to recur.

17

The parties (Board and psychologists) recognize that Petitioner has developed an understanding as to the underlying causes of his crime and an understanding as to how he will appropriately manage a similar situation, should it ever recur. Similarly, Petitioner has accepted responsibility for his crime and he does not seek to minimize its impact. Also, as in Hayward, his prison record "demonstrates persuasively that [Petitioner] can be released under supervisory conditions presenting no danger to public safety." A record including his multi-decade stellar work record in prison industries, joint venture programs, and other jobs, his participation in self-help groups including therapy oriented programs, his vocational and educational upgrading, the positive and parole supported psychological evaluations he has received, and strong family support and acceptable parole plans, etc.

Further, Petitioner, like Hayward, was substantially past the minimum number of years required for his sentence. In fact, he was almost eight years past his minimum term when the Governor reversed his second grant of parole. On that Irons measurement standard, giving his degree of conviction, Petitioner has served a comparatively lengthier term – versus the minimum required – than most, if not all, cases favorably cited in Hayward. Finally, when his parole was reversed Petitioner had a 21-year disciplinary free prison record, versus 16 for Hayward.

As shown, the State court's decision in this matter, as in Hayward was unreasonable. In this case, the Governor' sole reliance on a (now) 25+ year old crime relies on offense circumstances which no longer can be relied upon to accurately predict that Petitioner currently poses a danger to society, given both its second-degree nature and the stellar nature of his multi-decade post-conviction record, giving a clear appearance of his rehabilitation. See Hayward, at *28 and In re Lee, supra, 143 Cal.App.4th at 1412, holding that after 20 years, with a prison record such as Appellant's, the value of crime facts for predicting future actions has been reduced to no more than nil.

CONCLUSION

In sum, Appellant respectfully submits that as shown ante, the denial of his parole denied him due process, because as shown, no reliable evidence demonstrates Petitioner would currently pose an unreasonable risk to public safety, if released. Therefore, given his (then) 23½ (now 25+) years of positive imprisonment, the state's de facto decision otherwise was unreasonable. Accordingly, Petitioner respectfully requests his writ be granted.

18

# EXHIBIT A

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS


In the matter of the Life )
Term Parole Consideration )
Hearing of:               )      CDC Number C-70436
                          )
DAVID HART                )
                          )
_____)

INMATE
COPY


CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

AUGUST 17, 2006

3:30 P.M.

PENDING REVIEW
AND APPROVAL


PANEL PRESENT:

EDWARD C. WILLIAMS, Presiding Commissioner
FRED MARTEL, Deputy Commissioner

OTHERS PRESENT:

DAVID HART, Inmate
MIKE GUNNING, Attorney for Inmate
MR. VOGEL, Deputy District Attorney
CORRECTIONAL OFFICER(S), Unidentified


CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____  No     See Review of Hearing
_____  Yes    Transcript Memorandum


Ramona Cota            Peters Shorthand Reporting

ii

## INDEX

| | PAGE |
|---|---|
| Proceedings | 1 |
| Case Factors | 9 |
| Pre-Commitment Factors | 10 |
| Post-Commitment Factors | 21 |
| Parole Plans | 13 |
| Closing Statements | 35 |
| Recess | 46 |
| Decision | 47 |
| Adjournment | 50 |
| Transcriber Certification | 51 |

--oOo--

1

1                    P R O C E E D I N G S

2          **DEPUTY COMMISSIONER MARTEL:**  Okay, we are

3    on record.

4          **PRESIDING COMMISSIONER WILLIAMS:**  Okay,

5    this is a Subsequent Parole Consideration

6    Hearing for David Hart, CDC number C-70436.

7    Today's date is August the 17th, 2006, the time

8    is 3:30 p.m.  We are at the Correctional

9    Training Facility.  The inmate was received on

10   August the 1st, 1983 for murder in the second

11   degree with the use of a firearm.  He's serving

12   15 years to life plus two years for the firearm

13   from Fresno County, case number 2284864 with a

14   minimum eligible parole date of November the

15   11th, 1993.  We are going to identify each

16   person in the room.  Mr. Hart, I am going to

17   start and then we are going to go to you.  We

18   will say our first name, say our last name, and

19   spell our last name.  When we get to you if you

20   would include your CDC number I'd appreciate it.

21         **INMATE HART:**  Okay.

22         **PRESIDING COMMISSIONER WILLIAMS:**  I'm

23   Edward C. Williams, W-I-L-L-I-A-M-S,

24   Commissioner.

25         **INMATE HART:**  David Hart, H-A-R-T,

26   Charlie 70436.

27         **ATTORNEY GUNNING:**  Mike, Mike Gunning,

2

1    G-U-N-N-I-N-G, and I am the attorney for

2    Mr. Hart.

3         **DEPUTY DISTRICT ATTORNEY VOGEL:**

4    (Indiscernible) Vogel, V-O-G-E-L, Fresno County

5    District Attorney.

6         **DEPUTY COMMISSIONER MARTEL:**  My name is

7    Fred Martel, M-A-R-T-E-L, Deputy Commissioner

8    Board of Parole Hearings.

9         **PRESIDING COMMISSIONER WILLIAMS:**  Okay,

10   Mr. Hart, would you read that document there in

11   front of you.

12        **INMATE HART:**  "ADA, Americans with

13            Disabilities Act.  The Americans

14            with Disabilities Act, parentheses

15            ADA, is a law to help people with

16            disabilities.  Disabilities are

17            problems that make it harder for

18            some people to see, hear, breathe,

19            talk, walk, learn, think, work or

20            take care of themselves than it is

21            for others.  Nobody can be kept

22            out of public places or activities

23            because of a disability.  If you

24            have a disability you have the

25            right to ask for help to get ready

26            for your BPT Hearing, get to the

27            hearing, talk, read forms and

3

```
 1              papers and understand the hearing
 2              process.  BPT will look at what
 3              you ask for to make sure that you
 4              have a disability that is covered
 5              by the ADA and that you have asked
 6              for the right kind of help.  If
 7              you do not get the help, get help,
 8              or if you don't think you got the
 9              kind of help you need, ask for a
10              BPT 1074 Grievance Form.  You can
11              also get help to fill it out."
12         PRESIDING COMMISSIONER WILLIAMS:  Okay,
13    you read that well even though you wear glasses.
14    Did you have any trouble seeing the words there?
15         INMATE HART:  No sir.
16         PRESIDING COMMISSIONER WILLIAMS:  Can you
17    hear me okay?
18         INMATE HART:  I can hear you okay.
19         PRESIDING COMMISSIONER WILLIAMS:  You
20    have no physical problems that limited your --
21         INMATE HART:  No sir.
22         PRESIDING COMMISSIONER WILLIAMS:  -- your
23    getting here today, correct?
24         INMATE HART:  No sir.
25         PRESIDING COMMISSIONER WILLIAMS:  And on
26    October the 18th of 2005 you signed what is
27    called a 1073 form indicating that you had no
```

4

1    disabilities that limited you to come to this
2    hearing.  Is that correct?
3         **INMATE HART:**  That's correct sir.
4         **PRESIDING COMMISSIONER WILLIAMS:**  Any
5    further ADA issues that we should be discussing,
6    counsel?
7         **ATTORNEY GUNNING:**  No, thank you.
8         **PRESIDING COMMISSIONER WILLIAMS:**  Okay,
9    this hearing is being conducted pursuant to the
10   Penal Code and the rules and regulations of the
11   Board of Parole Hearings governing parole
12   consideration hearings for life inmates.  You
13   have been through this process before.
14        **INMATE HART:**  Yes I have.
15        **PRESIDING COMMISSIONER WILLIAMS:**  So you
16   understand it and you --
17        **INMATE HART:**  Yes I do.
18        **PRESIDING COMMISSIONER WILLIAMS:**  It's
19   kind of replica of the last one.  The purpose of
20   today's hearing is to consider your parole.  We
21   had the opportunity to review your Central File
22   and you will be given an opportunity to clarify
23   or correct the record.  We will consider your
24   progress since your commitment, your counselor's
25   report and your mental health evaluation.  We
26   are going to focus on the time period between
27   your last hearing and today.  And any change in

5

1    your parole plans should be brought to our

2    attention.  We are going to reach a decision

3    today and tell you what that decision is.  If

4    you are found suitable for parole the length of

5    your confinement is going to be explained to

6    you.  Before we recess for deliberations the

7    deputy district attorney, your attorney and you

8    will be given an opportunity to make a statement

9    regarding your parole suitability.  Your

10   statement will be limited to why you feel you

11   are suitable for parole.  We are then going to

12   recess and deliberate and call you back when we

13   have a decision and let you know what that

14   decision is.  The California Code of Regulations

15   states that regardless of time served a life

16   inmate shall be found unsuitable for and denied

17   parole if in the judgment of this panel the

18   inmate would pose an unreasonable risk of danger

19   to society if released from prison.  Do you

20   understand that sir?

21          **INMATE HART:**  Yes I do.

22          **PRESIDING COMMISSIONER WILLIAMS:**  You

23   have certain rights at this hearing.  I will ask

24   your counsel if those rights have been met to

25   this point?

26          **ATTORNEY GUNNING:**  Yes, thank you.

27          **PRESIDING COMMISSIONER WILLIAMS:**  You

6

1   have the additional right to be heard by an

2   impartial panel.  Do you have any objection to

3   the two panel members seated across the table

4   from you?

5           INMATE HART:  No I don't.

6           PRESIDING COMMISSIONER WILLIAMS:  Any

7   objection, counsel?

8           ATTORNEY GUNNING:  I don't.

9           PRESIDING COMMISSIONER WILLIAMS:  You

10  will receive a copy of our written tentative

11  decision today.  That decision becomes effective

12  within 120 days.  A copy of that decision and a

13  copy of the transcript of this hearing is going

14  to be sent to you.  You have a right to appeal

15  that decision.  Your counsel can help you with

16  that process should you choose.  You are not

17  required to admit to or discuss your offense so.

18  However the panel does accept as true the

19  findings of the court.  You understand that we

20  don't have the power to overrule the court or

21  the jury or whatever happened in the past.  Is

22  there any confidential information to be used?

23          DEPUTY COMMISSIONER MARTEL:  No.

24          PRESIDING COMMISSIONER WILLIAMS:  I have

25  passed a hearing checklist to your counsel, I

26  believe.

27          ATTORNEY GUNNING:  I do.

1          **PRESIDING COMMISSIONER WILLIAMS:**  And you
2     passed it to the deputy district attorney?
3          **ATTORNEY GUNNING:**  I did.
4          **DEPUTY DISTRICT ATTORNEY VOGEL:**  Yes.
5          **ATTORNEY GUNNING:**  I have those
6     documents, thank you.
7          **PRESIDING COMMISSIONER WILLIAMS:**  That's
8     the list of forms that we have looked at and we
9     want to make sure that everybody has access to
10    the same forms.  Do you have any additional
11    documents other than the ones you --
12         **ATTORNEY GUNNING:**  No sir, not at this
13    time.
14         **PRESIDING COMMISSIONER WILLIAMS:**  Do you
15    have any preliminary objections?
16         **ATTORNEY GUNNING:**  I have none.
17         **PRESIDING COMMISSIONER WILLIAMS:**  Will
18    the inmate be speaking with us today?
19         **ATTORNEY GUNNING:**  He is not going to
20    discuss the facts of the offense with you.  He's
21    been at this for quite a long time.  As you
22    already noted this is going to be, I think, his
23    ninth or tenth overall hearing.  But he's more
24    than happy to discuss how he feels about what he
25    did and anything else you would like to talk to
26    him about.
27         **PRESIDING COMMISSIONER WILLIAMS:**  Okay,

8

1   so you are not going to discuss the crime?

2          **INMATE HART:**  I am not going to discuss

3   the circumstances of the offense, no sir.

4          **PRESIDING COMMISSIONER WILLIAMS:**  Okay.

5   Now --

6          **INMATE HART:**  I accept full

7   responsibility.

8          **PRESIDING COMMISSIONER WILLIAMS:**  Okay.

9   just listen, okay.  I am going to just remind

10  you that you are exercising a very serious

11  right.  And I want you to exercise it and don't

12  let your mind wander and start talking about the

13  circumstances of that crime.  And if someone

14  asks you a question about it, don't answer it.

15  And I'll make sure that nobody does.  But if

16  somebody does I want to be aware that you don't

17  have to because you have chosen not to discuss

18  it, okay.

19         **INMATE HART:**  Yes sir.

20         **PRESIDING COMMISSIONER WILLIAMS:**  All

21  right.  As to other things other than the

22  commitment offense I want you to raise your

23  right hand to be sworn.  Do you solemnly swear

24  or affirm that the testimony you give at this

25  hearing will be the truth, the whole truth and

26  nothing but the truth?

27         **INMATE HART:**  Absolutely.

9

```
 1          PRESIDING COMMISSIONER WILLIAMS:  Okay.
 2    I am going to read a summary of the crime found
 3    in the Board Report prepared for the hearing in
 4    July of 2002.  That says that:
 5          "On June 3, 1982 at eight a.m. a
 6          California patrol officer
 7          discovered an abandoned vehicle,
 8          an International Scout belonging
 9          to the victim, Michael
10          Inperatrice --"
11    I-N-P-E-R-I, let me start over, I-N-P-E-R-A-T-R-
12    I-C-E.
13          "-- who had been listed as a
14          missing person for several days.
15          A search inside the vehicle
16          revealed extensive bloodstains.
17          The sheriff's officer also
18          discovered apparent bloodstains on
19          a nearby ridge.  During a
20          subsequent search they found the
21          victim's body about one mile south
22          of that ridge.  An autopsy
23          revealed the cause of death to be
24          three .32 caliber gunshot wounds
25          to the head.  Two bullets entered
26          the victim's head below and behind
27          the left ear and the third entered
```

```
 1            the back of the skull.  During a
 2            follow-up investigation Della
 3            Casselman (phonetic) identified
 4            the victim as her boyfriend.  She
 5            said she had just terminated a
 6            year-and-a-half relationship with
 7            David Hart.  Hart had told her he
 8            could not stand to lose her and
 9            told her, I'll kill him, I'll kill
10            him.  He stole you away from me.
11            Jack Kromberg, K-R-O-M-B-E-R-G, a
12            friend of David Hart's, testified
13            that Hart told him he shot the
14            victim and then put him in a
15            canal.  Hart told Kromberg that he
16            jogged to Della Casselman's house
17            and observed the victim's jeep.
18            Hart told him he hid in the back
19            of the jeep under a blanket and
20            confronted the victim after he had
21            driven away from Casselman's
22            residence.  Hart had the victim
23            drive to an orchard where he
24            killed him."
25  You did not have any criminal record?
26        INMATE HART:  No sir.
27        PRESIDING COMMISSIONER WILLIAMS:  Not as
```

11

1    a juvenile or as an adult?

2         **INMATE HART:**  Not as a juvenile or as an

3    adult.

4         **PRESIDING COMMISSIONER WILLIAMS:**  You are

5    now 41 years old?

6         **INMATE HART:**  Forty-six years old.

7         **PRESIDING COMMISSIONER WILLIAMS:**  Forty-

8    six.

9         **INMATE HART:**  Today.

10        **PRESIDING COMMISSIONER WILLIAMS:**

11   Congratulations.

12        **INMATE HART:**  Thank you sir.

13        **PRESIDING COMMISSIONER WILLIAMS:**  Have

14   you read -- Well this Board Report is kind of

15   old.   There's a more recent, a more recent one

16   but --

17        **INMATE HART:**  2005?

18        **PRESIDING COMMISSIONER WILLIAMS:**  It

19   doesn't have the information that I need.  So I

20   will just continue with the previous.  You were

21   born in Santa Monica?

22        **INMATE HART:**  Yes sir.

23        **PRESIDING COMMISSIONER WILLIAMS:**  Have

24   any brothers and sisters?

25        **INMATE HART:**  I have one older brother.

26        **PRESIDING COMMISSIONER WILLIAMS:**  Do you

27   maintain a relationship with him?

12

1          **INMATE HART:**  Yes I do.  His name is
2     William T. Hart.
3          **PRESIDING COMMISSIONER WILLIAMS:**  And
4     your parents?
5          **INMATE HART:**  I still have relationships,
6     a very close relationship with my parents and my
7     brother and his family.
8          **PRESIDING COMMISSIONER WILLIAMS:**
9     Graduated from high school in Fresno.
10         **INMATE HART:**  Yes sir.
11         **PRESIDING COMMISSIONER WILLIAMS:**  You
12    were attending Fresno City College when this
13    occurred?
14         **INMATE HART:**  Yes sir.
15         **PRESIDING COMMISSIONER WILLIAMS:**  You
16    have never been married?
17         **INMATE HART:**  Never been married.
18         **PRESIDING COMMISSIONER WILLIAMS:**  And no
19    children?
20         **INMATE HART:**  No children.
21         **PRESIDING COMMISSIONER WILLIAMS:**  You
22    have been arrested for public drunk, is that
23    correct?
24         **INMATE HART:**  That's correct.
25         **PRESIDING COMMISSIONER WILLIAMS:**  And you
26    smoked marijuana in high school.
27         **INMATE HART:**  Yes.

13

1          **PRESIDING COMMISSIONER WILLIAMS:**  Tell me
2     what you will do if you were on parole.

3          **INMATE HART:**  If I'm on, once I'm
4     released on parole I'm going to finish my
5     education.  I would like to get my bachelor's
6     degree in accounting at Fresno State.  And maybe
7     pursue a higher degree like a master's degree in
8     business, get an MBA.  And I would also like to
9     take care of my family.  My parents are getting
10    old and my brother needs help with them so he
11    doesn't have to carry the whole responsibility
12    of taking care of my folks.  And I would like to
13    be part of the family again.

14         **PRESIDING COMMISSIONER WILLIAMS:**  Okay.
15         **INMATE HART:**  I would also like to -- You
16    know what else I would like to do on parole too?
17         **PRESIDING COMMISSIONER WILLIAMS:**  Sure.
18         **INMATE HART:**  I think I'd like to also
19    volunteer to try to give back to the community.
20    I'd especially like to talk to young people at
21    the Sheriff's Department if they have, if they
22    go out and talk to the schools.  And have them
23    use me as an example of what not to do and what
24    violent crime, the damage it causes the families
25    and use me as a sounding board.

26         **PRESIDING COMMISSIONER WILLIAMS:**  Who is
27    W. H. Wright?

14

1      **INMATE HART:**  He is going to be my future
2   employer when I get out.  He is the president of
3   Weather-Tec, a sprinkler manufacturer, in
4   Fresno.  He is a, I wold like to say childhood
5   but he went to high school with my father.
6      **PRESIDING COMMISSIONER WILLIAMS:**  So you
7   know him through your parents.
8      **INMATE HART:**  I know him through my
9   parents.
10     **PRESIDING COMMISSIONER WILLIAMS:**  A good
11  friend of your father's for decades, I guess,
12  over 50 years.  He offers you a job.
13     **INMATE HART:**  Yes sir.  There is a letter
14  indicating that.
15     **PRESIDING COMMISSIONER WILLIAMS:**  Right
16  here.  He doesn't suggest that you come by for
17  an interview or fill out an application.
18     **INMATE HART:**  No.
19     **PRESIDING COMMISSIONER WILLIAMS:**  He is
20  offering you a job.
21     **INMATE HART:**  Absolutely.
22     **PRESIDING COMMISSIONER WILLIAMS:**  Without
23  any question, correct?
24     **INMATE HART:**  Without any questions,
25  that's correct.
26     **PRESIDING COMMISSIONER WILLIAMS:**  And a
27  letter here from your parents.  They obviously

15

1  support your release on parole.

2      **INMATE HART:**  Yes they do and I think

3  that's the letter that -- What's the date on

4  that letter, sir?

5      **PRESIDING COMMISSIONER WILLIAMS:**  August

6  the 4th of 2006.

7      **INMATE HART:**  I think they state in there

8  that I'll be living with them.

9      **PRESIDING COMMISSIONER WILLIAMS:**  They

10  will welcome you to their home.  They feel that

11  you are committed to becoming a model citizen.

12  They don't think that you will be a threat to

13  society.  They have a car there for your use.

14      **INMATE HART:**  Yes they do.

15      **PRESIDING COMMISSIONER WILLIAMS:**  TO go

16  to school and work and (inaudible).

17      **INMATE HART:**  Exactly.

18      **PRESIDING COMMISSIONER WILLIAMS:**  Your

19  brother, W. T. Hart.  He writes a very nice

20  letter in support of your parole.  He has three

21  daughters.  He describes some of the programming

22  that you have accomplished while in prison.  You

23  have a lot of family support.

24      **INMATE HART:**  Yes I do sir.

25      **PRESIDING COMMISSIONER WILLIAMS:**  Pamela

26  Halperin (phonetic).

27      **INMATE HART:**  That's my brother's ex-wife

16

1   and the mother of my nieces.

2          **PRESIDING COMMISSIONER WILLIAMS:**   Okay.
3   Tell me about her.

4          **INMATE HART:**   She is a big supporter of
5   mine.  She has helped me a little bit with the
6   accounting.  She is a CPA herself.  She works
7   for the IRS.  And she has offered any kind of
8   support that I might need.

9          **PRESIDING COMMISSIONER WILLIAMS:**   Known
10  you for 20 years.

11         **INMATE HART:**   As long as, yeah, since she
12  married my brother.  Like in the late '80s I
13  think it was.  So not 20 years, it would be less
14  than that.  A little bit less.

15         **PRESIDING COMMISSIONER WILLIAMS:**   She
16  says you have matured over the period of time,
17  correct?

18         **INMATE HART:**   Yes sir.

19         **PRESIDING COMMISSIONER WILLIAMS:**   Patrick
20  Cervelli, C-E-R-V-E-L-L-I.  Tell me about
21  Patrick.

22         **INMATE HART:**   Mr. Cervelli was my
23  neighbor, lived across from where my parents
24  still do.  I was friends with his -- he had a
25  big family and I was friends with his sons.  We
26  were all less than I'd say 12 years old at the
27  time.  I baby-sitted for them occasionally.  But

17

 1  then I also, he was, he's an ice cream

 2  distributor, was.  I went to work for him

 3  managing an ice cream store, a retail ice cream

 4  store in Fresno.  And ever since I came to

 5  prison he has been a supporter of mine.  And up

 6  until he sold his business last year I think he

 7  had offered me a standing job with his company.

 8  He had the Dreyer's ice cream -- or Breyers and

 9  Haagen-Dazs ice cream distributorship in the

10  whole Central Valley and he was going to give me

11  a job.  But then he sold the business to Foster

12  Farms and now he's retired.  But I stay in close

13  contact with him.

14       **PRESIDING COMMISSIONER WILLIAMS:**  That's

15  what he says.  He says he talks to you on the

16  phone regularly.

17       **INMATE HART:**  Regularly.

18       **PRESIDING COMMISSIONER WILLIAMS:**

19  (Inaudible).  Aaron Cervelli?

20       **INMATE HART:**  That's his next to the

21  oldest son.  He's an adult now, he lives in

22  Montana.  He has a snowmobile dealership in

23  Montana.  We stayed close too.  He was one of

24  the children that used to come over to my house.

25       **PRESIDING COMMISSIONER WILLIAMS:**  He's 29

26  years old now.

27       **INMATE HART:**  Yes.

1          **PRESIDING COMMISSIONER WILLIAMS:**    He
2     offers you a job with his company also
3     (overlapping).

4          **INMATE HART:**    Right, I used to work
5     under -- Excuse me.

6          **PRESIDING COMMISSIONER WILLIAMS:**    Let me
7     speak to you.   We're making a tape-recording of
8     this.   And the very hardworking person that is
9     going to transcribe this has to get it all down
10    so that we can provide you with a copy that you
11    can use, okay.   I know this is very important to
12    you.   I don't want to miss anything or imply
13    that it's not.   However, (inaudible)
14    conversation necessary for the record.

15         **INMATE HART:**    I'm sorry sir.

16         **PRESIDING COMMISSIONER WILLIAMS:**    All
17    right.   He offers you a job but you're not going
18    to Montana.   But he certainly supports your
19    release from prison and he has known you for a
20    very long time.

21         **INMATE HART:**    Yes sir.

22         **PRESIDING COMMISSIONER WILLIAMS:**
23    Correct?

24         **INMATE HART:**    Correct sir.

25         **PRESIDING COMMISSIONER WILLIAMS:**    I
26    assume this is pictures of the --

27         **INMATE HART:**    That's the address where

19

1   I'll be --

2          PRESIDING COMMISSIONER WILLIAMS:   --
3   (inaudible) home?

4          INMATE HART:   That's my parents' home.

5          PRESIDING COMMISSIONER WILLIAMS:   I
6   assume these are pictures of your parents with
7   their beautiful home.

8          INMATE HART:   Yes sir.

9          PRESIDING COMMISSIONER WILLIAMS:   It
10  appears to be large enough to incorporate you,
11  correct?

12         INMATE HART:   Yes sir.   Correct sir.

13         PRESIDING COMMISSIONER WILLIAMS:   All
14  right.   So you have a job offer that is a firm
15  job offer.   You have family support, extensive
16  family support.

17         INMATE HART:   Yes I do.

18         PRESIDING COMMISSIONER WILLIAMS:   A
19  suitable place to live.   They offer you a car.
20  They will support your continued education and
21  you have a desire to continue that education, is
22  that correct?

23         INMATE HART:   That's correct sir.

24         PRESIDING COMMISSIONER WILLIAMS:   All
25  right.   I would say that you have appropriate
26  parole plans.   Does that seem reasonable to you?

27         INMATE HART:   Yes but there is one thing

20

1   you omitted.  I don't know if it's much of

2   interest but I --

3        **PRESIDING COMMISSIONER WILLIAMS:**

4   (Overlapping).

5        **INMATE HART:**  Excuse me?

6        **PRESIDING COMMISSIONER WILLIAMS:**  We are

7   making a record so (inaudible).

8        **INMATE HART:**  I don't know if this is the

9   appropriate time to bring it up.

10       **PRESIDING COMMISSIONER WILLIAMS:**  Is it

11   regarding parole plans?

12       **INMATE HART:**  Yes sir.

13       **PRESIDING COMMISSIONER WILLIAMS:**  Then

14   bring it up.

15       **INMATE HART:**  I have over $15,000 saved

16   up from my joint venture work that I did but the

17   only record that I would be able to provide the

18   Board with today was the Ameritrade statement

19   that showed I had like $8400.  The other money

20   is in a bank account.  My mom was unable to send

21   me the statement in time because we have a mail

22   delay here of almost two weeks before we get the

23   actual letter.

24       **PRESIDING COMMISSIONER WILLIAMS:**  Okay.

25       **INMATE HART:**  So I have some money saved

26   up.

27       **PRESIDING COMMISSIONER WILLIAMS:**  The

1   fact is that you have been frugal and you have

2   some money saved up.  And that would assist you

3   if you were released from prison for a period of

4   time, correct?

5        **INMATE HART:**  That's correct.

6        **PRESIDING COMMISSIONER WILLIAMS:**  Okay.

7   What else should we talk about regarding parole

8   plans?

9        **INMATE HART:**  That was pretty much it

10  that I can think of at the moment.

11       **PRESIDING COMMISSIONER WILLIAMS:**  Have we

12  covered it pretty well?

13       **INMATE HART:**  I think so.

14       **PRESIDING COMMISSIONER WILLIAMS:**  If you

15  think of something else before this hearing is

16  concluded you bring it to my attention, all

17  right.

18       **INMATE HART:**  I will sir.

19       **PRESIDING COMMISSIONER WILLIAMS:**  Okay,

20  we'll go to Post-conviction factors.

21       **DEPUTY COMMISSIONER MARTEL:**  Okay, this

22  is the Parole Consideration Hearing number nine.

23  Post conviction factors for prisoner David Hart,

24  C-70436 received by CDC on August the 1st, 1983.

25  The documents reviewed for post-conviction

26  information were the Central File, the Life

27  Prisoner Evaluation Report prepared for the

22

1    December 2005 calendar by Correctional Counselor

2    I, G. Peabody, spelled P-E-A-B-O-D-Y, and the

3    post-conviction progress reports covering the

4    period of April 2004 through April 2005 to

5    October of 2005.  And those reports were

6    prepared by Correctional Counselor I, G.

7    Peabody.  Also the psychological evaluation

8    prepared for the November 29, 2005 calendar by

9    Dr. Laura Petracek.  Let me spell it.  P-E-T-R-

10   A-C-E-K, Ph.D.  And in her report she indicates

11   a diagnosis of Axis I poly-substance abuse by

12   history in institutional remission, Axis II is

13   deferred and Axis III is none.  And she gives a

14   Global Assessment of Functioning of 80.  In

15   regards to the assessment of dangerousness she

16   indicates here:

17           "Within a controlled setting his

18           risk is minimal.  Or if released

19           into the community the risk is

20           also minimal.  Significant risk

21           factors and precursors to violence

22           are his past substance abuse and

23           relapse would increase his risk

24           for violence and undo the gains he

25           has made.  If paroled he should

26           be --"

27   Excuse me.  That was very short.  This indicates

```
 1   the comments and recommendations:
 2              "If paroled he should be mandated
 3              to attend AA and NA meetings and
 4              have periodic drug testing for
 5              alcohol and illegal substances.
 6              Mr. Hart continues to remain a
 7              stable individual committed to his
 8              work, studies and family.
 9              Mr. Hart's history within CDC's
10              facility related to his
11              disciplinary record, behavior and
12              work record all attest to his
13              stability and sound decision-
14              making skills.  It is my
15              professional opinion that his
16              release into the community and
17              parole should be based on custody
18              and not psychological factors."
19   The report is basically favorable to the inmate.
20   The prior BPT action was at the time of
21   Mr. Hart's last parole consideration hearing on
22   April 5, 2004.  He was housed at RJ Donovan
23   Correctional Facility.  The Board took action to
24   deny parole for one year and recommended the
25   parolee do the following.  Continue to program,
26   remain discipline-free and transfer to San
27   Quentin for educational programs.  However he
```

24

1    was transferred to CTF Soledad.  The inmate is

2    currently a classification score of 19 and a

3    custody level of Medium-B.  As to his

4    programming and the recommendations of the Board

5    in regards to vocational instruction.  He has

6    not participated in any vocational instruction

7    since the last parole consideration hearing.

8    However, he does have a certificate of

9    completion in -- I noted the certificate of

10   completion and didn't put what it was.

11        **ATTORNEY GUNNING:**  In voc upholstery.

12        **DEPUTY COMMISSIONER MARTEL:**  In

13   upholstery, that's correct.  In upholstery.

14   That again was back on June 9 of 1996.

15   Academically, excuse me, he has taken classes

16   corresponding with Indiana University School of

17   Continuing Studies and has completed

18   Intermediate Financial Accounting.  That was

19   done on November the 24th, 2004.  And I did note

20   that he does have a AA degree from San Joaquin

21   Delta College and he received that AA on June

22   14, 1985.  His work participation has been good.

23   In the past he worked in the canteen at RJ

24   Donovan and did receive exceptional ratings and

25   chronos dated April 1, 2004, June 9, 2004 and

26   July 1, 2004.  He arrived here at CTF at the

27   position of a porter.  That from December of '04

1   to February of '05.  Okay.  And I didn't show
2   what your position is now if you're working in a
3   position.

4       **INMATE HART:**  No, I am not working at the
5   moment.

6       **DEPUTY COMMISSIONER MARTEL:**  No, okay.
7   (Inaudible).

8       **INMATE HART:**  Exactly.

9       **DEPUTY COMMISSIONER MARTEL:**  Okay.  Let
10  me also go back to academics.  I did receive
11  here a, received here from Indiana University
12  School of Continuing Studies in the business
13  department that he did complete the Intermediate
14  Financial Accounting II and received a grade of
15  A.  So he has taken three classes there just in
16  his last quarter.  Excuse me, in the last period
17  that we're covering.  In regards to psychiatric
18  treatment the inmate is not involved in the
19  inmate mental health program and has not
20  received any psychiatric treatment.  There is
21  participation in self-help groups.  He has
22  participated in NA and AA with chronos covering
23  the quarterly periods of June 30, 2004,
24  September 30, 2004.  For AA here at CTF there is
25  a chrono here for June 28 of 2005.  And also he
26  did receive a certificate of completion of the
27  IMPACT program, which is I believe a 14-week

1  program.

2      **INMATE HART:**  Yes sir.

3      **DEPUTY COMMISSIONER MARTEL:**  He received

4  that certificate on November 14, '05 and

5  received a corresponding laudatory chrono in

6  regards to completing the IMPACT program from

7  facilities captain I. Guerra, G-U-E-R-R-A.  That

8  is also dated November 14, 2005.  He also has

9  laudatory chronos for his participation in NA in

10  the fourth quarter of January 6, 2006.  And

11  these were in the way of laudatory chronos.  And

12  also going back to September 21, 2005 for the

13  third quarter.  And those were from J. Kramer

14  (phonetic), who was the sponsor of the program.

15  And he also has two certificates for

16  participating in a self-help program.  So he is

17  certainly involved in his social skills there.

18  The inmate's disciplinary history is that he has

19  one 115.

20      **ATTORNEY GUNNING:**  Could we go off he

21  record?

22      **PRESIDING COMMISSIONER WILLIAMS:**  We'll

23  take a brief recess.

24          (The tape was turned over.)

25      **DEPUTY COMMISSIONER MARTEL:**  Okay, we're

26  back on record.

27      **PRESIDING COMMISSIONER WILLIAMS:**  Okay.

27

1          **DEPUTY COMMISSIONER MARTEL:** In terms of
2    disciplinary, the inmate has one 115 going back
3    to January 27 of 1986 for possession of
4    marijuana. And that is the one and only
5    disciplinary report. There are no 128(a)s. He
6    certainly should be commended for his lack of
7    any disciplinary problems while in the
8    institution. So in terms of his complying with
9    the Board recommendations he has just about made
10   good on all of those. He has remained
11   discipline-free, he has upgraded his education
12   and has participated in self-help groups and
13   received positive chronos. So he certainly
14   should be commended. I know that you gave a
15   list here of many, many different activities,
16   programs that you have been involved in.
17   However we are just going over since the last
18   hearing. However certainly those can be
19   addressed by your attorney in closing. So now
20   is there anything that we missed from this
21   period?

22         **INMATE HART:** Not that I can think of at
23   the moment.

24         **DEPUTY COMMISSIONER MARTEL:** Okay,
25   Mr. Hart. And counsel, is there anything
26   further in regards to post-conviction factors?

27         **ATTORNEY GUNNING:** No, thank you.

1        **DEPUTY COMMISSIONER MARTEL:**  Okay, thank

2   you.   Then I'll return it back to Mr. Williams

3   as I have no questions.

4        **PRESIDING COMMISSIONER WILLIAMS:**  Do you

5   have -- You have no questions?

6        **INMATE HART:**  No.

7        **PRESIDING COMMISSIONER WILLIAMS:**  Okay.

8   Let me ask you one thing.   There was a reference

9   to an October 3, 2003 psychiatric evaluation by

10  Dr. Mura wherein you were asked, what would you

11  change if you could alter only one thing in your

12  life.   The evaluation, Dr. Mura stated the

13  response suggested some insight into his

14  personality dynamics.   However it also suggested

15  some lingering grandiosity and he felt the need

16  to rationalize away negative background factors.

17  What do you think of that?

18       **INMATE HART:**  When I answered that

19  question I really didn't take enough time to

20  think about what she had asked me.   And the best

21  I remember I said something that I'd like to go

22  back, because I'm adopted, to live with my birth

23  parents.   That's the best I remember, I'm not

24  sure exactly.   But the basic thing that I meant

25  to tell her was that I would have changed my

26  life so it would be completely different than

27  the way it turned out to be.   I just mis-

1    answered the question.  I don't (inaudible).  It

2    was a really hypothetical question about going

3    back in time or something like that.  I was --

4    At the time I was just finding out some

5    information about my birth mother and had

6    recently got a picture of her from a school

7    yearbook, a college yearbook.  So I was thinking

8    about her at the time.

9         **PRESIDING COMMISSIONER WILLIAMS:**  Okay.

10   Questions, Mr. Vogel?

11        **DEPUTY DISTRICT ATTORNEY VOGEL:**  Yes.

12   Could you ask the inmate if any of his self-help

13   classes have dealt with at all the issue of

14   dealing with women and rejection?

15        **PRESIDING COMMISSIONER WILLIAMS:**  Can you

16   answer that question?

17        **INMATE HART:**  Self-help classes.  I would

18   say the Hands of Peace probably dealt with it.

19   In fact it taught us how to resolve problems,

20   conflict, by reaching common ground with people

21   and not trying to be assertive and not try to be

22   aggressive.  How you deal with relationships,

23   whether they are loved ones or strangers.

24   That's one class.  That class certainly had some

25   impact in it.  Morals and Values, that class

26   helped me reestablish my morals that I had since

27   I was a kid before I committed this crime.  And

30

1  I would have to say the biggest help probably
2  was the one-on-one therapy that I had in my
3  Category-T program in the mid-90s.  That helped
4  me deal with relationships and how to resolve
5  relationships and deal with any kind of problem
6  that might arise.
7      **PRESIDING COMMISSIONER WILLIAMS:**  Okay,
8  any further questions, sir?
9      **DEPUTY DISTRICT ATTORNEY VOGEL:**  Yes.
10  Could you ask the inmate how he would plan to
11  work and go to school?
12      **PRESIDING COMMISSIONER WILLIAMS:**  Can you
13  answer that question?
14      **INMATE HART:**  I would work during the day
15  and go to school in the evening.  Or I'd work
16  part-time.  It depends on the workload that I
17  have.  There is nothing specific yet exactly
18  what my job description is going to be and how
19  many hours a week that I'm going to work.  But
20  once I figure all that out, if I'm working full-
21  time then I'll have to go to evening school.
22      **PRESIDING COMMISSIONER WILLIAMS:**  Okay.
23      **INMATE HART:**  Which I have done before.
24  Not here.  I mean when I was free before that's
25  what I did.  I worked full-time and I went to
26  City College in the evening.
27      **PRESIDING COMMISSIONER WILLIAMS:**  Okay.

31

1          DEPUTY DISTRICT ATTORNEY VOGEL:   The

2   final question.   What is the approximate age of

3   his parents?

4          PRESIDING COMMISSIONER WILLIAMS:   What's

5   the age of your parents?

6          INMATE HART:   My father was born in 1927

7   so he's 79.   And my mom is four years, she's 75.

8   My mother works and my dad is retired.

9          PRESIDING COMMISSIONER WILLIAMS:   Okay.

10          DEPUTY DISTRICT ATTORNEY VOGEL:   I would

11   ask another question.   Will he have any other

12   options if his parents (inaudible) for

13   residence?

14          INMATE HART:   I could live with my

15   brother.   He has stated that in the past that I

16   could live with him.

17          PRESIDING COMMISSIONER WILLIAMS:   Okay,

18   and he lives in Fresno?

19          INMATE HART:   He lives in Fresno too.

20          PRESIDING COMMISSIONER WILLIAMS:   Okay.

21          INMATE HART:   In fact his oldest daughter

22   just left for school to go to college in

23   Berkeley so her room would be available to me.

24          DEPUTY DISTRICT ATTORNEY VOGEL:   Okay,

25   nothing further.

26          PRESIDING COMMISSIONER WILLIAMS:

27   Questions counsel?

```
1        ATTORNEY GUNNING:  Yes, thank you.
2   Mr. Hart, I want to tie in real quick like with
3   the questions asked of you about self-help and
4   how it relates to relationships and things of
5   that nature.  I guess an important question to
6   ask you is this.  If you were to be put in a
7   similar situation as you were put back in when
8   you committed this offense and you had a
9   relationship with another woman and the dynamics
10  were similar in terms of the potential for her
11  leaving you, okay.  As the result of your
12  involvement in self-help how would you handle a
13  situation like that as compared to how you
14  handled it before?  Specifically if somebody
15  else is involved as well.
16       INMATE HART:  Are you talking before she
17  actually would break up with me or after?  It's
18  kind of confusing.  Like how would I try to like
19  fix the relationship before it actually ended or
20  would it --
21       ATTORNEY GUNNING:  Yeah, let me rephrase
22  it, let me rephrase it for you.  There were
23  dynamics involved between you and Mike and
24  Debra, correct?
25       INMATE HART:  Della.
26       ATTORNEY GUNNING:  Della, excuse me.  And
27  that resulted in Mike's death.
```

33

1          **INMATE HART:**  Right.

2          **ATTORNEY GUNNING:**  And so now my question

3     to you is, you participated in self-help

4     programs over the years in these institutions.

5     And because of what you have learned, if you

6     were to be put into a similar situation where

7     there was another woman and another man and she

8     elected to leave you to be with him, what would

9     you do about it now?

10         **INMATE HART:**  I would respect her

11    decision for ending the relationship.  For

12    whatever reason she decided, whether it be

13    another person or she didn't want to be with me

14    any longer.  I would -- I don't want to be with

15    anybody that doesn't want to be with me.  I

16    would sever all -- If I felt as strongly about

17    the person like I did with Ms. Casselman I would

18    several all relationship.  I wouldn't remain

19    friends in her same circle of friends.  I would

20    give me a lot of time to get over my

21    relationship if I had strong feelings.

22         **ATTORNEY GUNNING:**  There was some talk in

23    the file about the fact that you may have had

24    some self-esteem issues and how that may have

25    been connected to the commitment offense.  As a

26    result of your participation in self-help and as

27    a result of your involvement in all the programs

34

1  that you been in since you have been
2  institutionalized what have you done to improve
3  your self-esteem?
4       **INMATE HART:**  I have always strived to
5  improve myself and do things that are
6  challenging and that might have a bearing on
7  what I do when I get out.  Like good jobs,
8  prison industries or joint ventures.  I haven't
9  just settled for nothing jobs like porter.  And
10  by doing that I have been successful in rising
11  to these positions and that has given me a lot
12  of self-esteem, a lot of confidence in my
13  abilities and what I can do.  And when I was
14  younger I didn't have (inaudible).
15       **ATTORNEY GUNNING:**  With regard to
16  education.  Why is it so important to you to
17  have a college degree?  Why is it important for
18  you to maintain involvement in college classes?
19  Why is it important?
20       **INMATE HART:**  Not only to get better
21  educated and to pursue a career but also for the
22  sense of accomplishment that I completed
23  something.
24       **ATTORNEY GUNNING:**  I just have one last
25  question, Commissioner, and that's this.  Over
26  the course of 23 years or so of incarceration
27  you got that one 115 that was referred to.  And

35

1  I guess my question to you is, given the nature
2  of the individuals that oftentimes end up in
3  these institutions how have you been able to
4  maintain a disciplinary-free program?
5       **INMATE HART:**  By committing myself to
6  being  better human being and following all the
7  rules and regulations of the society that I live
8  in and staying away from people that don't
9  behave like that.
10      **ATTORNEY GUNNING:**  That's all I have,
11  thanks.
12      **PRESIDING COMMISSIONER WILLIAMS:**  Okay,
13  before we continue would you tell me how old you
14  were when you committed this crime.
15      **INMATE HART:**  I was 21 years old.
16      **PRESIDING COMMISSIONER WILLIAMS:**  And how
17  old are you now?
18      **INMATE HART:**  Forty-six.
19      **PRESIDING COMMISSIONER WILLIAMS:**  Okay.
20  Closing, Mr. Vogel.
21      **DEPUTY DISTRICT ATTORNEY VOGEL:**  The
22  District Attorney's Office is bothered by the
23  cold, calculated, premeditated facts of the
24  underlying crime.  However based on Mr. Hart's
25  performance in the institution, his progress and
26  his parole plans the District Attorney's Office
27  is not going to have (inaudible).

36

1         **ATTORNEY GUNNING:**  Thank you.

2         **PRESIDING COMMISSIONER WILLIAMS:**

3    (Inaudible).

4         **ATTORNEY GUNNING:**  Thank you.  We would

5    concur with the DA's assessment of the act of

6    murder.  I think any time anybody is killed in

7    the manner that Mike was killed it's troubling.

8    And rather than going into a lot of detail into

9    the circumstances and the facts and maybe why it

10   happened, I think it's been discussed many, many

11   times over the course of the nine hearings.

12   This will be the ninth hearing, I believe, that

13   he has been participating in.  I guess the

14   question is whether or not the individual that

15   sits in front of you today is a different person

16   than then person that was sitting -- that was

17   out there on the streets and committed this

18   offense when he was 21.  And if so then how do

19   we identify that?  Mike didn't deserve to die.

20   His family didn't deserve to go through what

21   they went through and what they are still going

22   through.  And David knows that.  And he'll have

23   the opportunity to discuss that in his own way

24   in his own fashion when he has the time, has the

25   chance to talk.  So I am not going to spend much

26   more time on that.  But what I will say is this

27   occurred back in 1982 so it has been 24 years

```
 1  since the commitment offense. That in and of
 2  itself is not a reason to release somebody but
 3  it is a long time and it allows somebody to
 4  spend a lot of time investigating why they did
 5  what they did. And I would submit that over the
 6  years he has had a lot of time and a lot of
 7  opportunity to investigate and to gain the
 8  insight he needed and to do the best he could to
 9  rationalize why he did what he did. He could
10  never entirely rationalize in a rational way,
11  you just can't do it. But you can try and
12  figure out what were the underlying components.
13  The self-esteem issues, the abandonment issues,
14  things that were addressed by psychologists.
15  And I think over the course of time over the 20-
16  some odd years that he has been incarcerated he
17  has been able to identify those underlying
18  factors. He has been able to address and he has
19  been able to participate in programs that have
20  allowed him to in some respects address those
21  issues so that when he does get back on the
22  streets, whether it's now or later, he won't
23  find himself in a situation where he is going to
24  do the same type of offense again. He is a very
25  unique individual. It's difficult sometimes to
26  come in here and try to explain somebody's life
27  in a nutshell. But what I would like you to do,
```

1   if you don't mind, is I'd like to draw an
2   analogy perhaps to a case that I think has a lot
3   of parallels.  Maybe -- Was that the tape?
4           (The tape was turned over.)
5       **DEPUTY COMMISSIONER MARTEL:**  Okay, we're
6   back on record.  We turned the tapes over.
7       **PRESIDING COMMISSIONER WILLIAMS:**  Okay,
8   if you will continue sir.  Sorry for the
9   interruption.
10      **ATTORNEY GUNNING:**  No problem, thank you.
11  I was going to draw an analogy to another case,
12  and that's the Ronsenkrantz case, but I think
13  rather than doing that right now I'm just going
14  to go ahead and go through some of the criteria
15  I think are important for this panel to
16  recognize.  From the standpoint of suitability,
17  pre-conviction wise, you know, Dave was a high
18  school grad.  He didn't have any problems with
19  the law.  He was law-abiding for the most part.
20  He had an arrest for drunk in public and he had
21  some involvement with marijuana and we
22  acknowledge that.  But he also had a work
23  history.  He was a manager, he was managing a
24  company for an office in the ice cream business.
25  Which would indicate in many respects a work
26  ethic and leadership skills.  You don't do that
27  unless you have some kind of ability to manage

39

 1   people and he apparently had that.  No mental
 2   illness that we're aware of anywhere in his
 3   record.  No evidence of gang activity of any
 4   sort.  And I would differ I think in some
 5   respect with regard to the comment made by the
 6   psychologist about substance abuse.  I
 7   understand why she said it, because there's been
 8   some evidence of his use.  But if you look at
 9   some of the other evaluations they would
10   indicate that he did not have a significant
11   history of substance abuse and they didn't have
12   any concerns about abuse in their assessments.
13   And most importantly, none of them seemed to
14   indicate that there was any involvement of
15   substances, either alcohol or drugs, as it
16   relates to this commitment offense.  There's
17   also a lot of evidence that he grew up in a
18   stable environment, in his family they were
19   loving, loving parents.  So there's an awful lot
20   of factors going on pre-conviction wise that
21   would support suitability.  And I would ask you
22   to go back and look at the 1996 decision by
23   Commissioner Giaquinto where he went through
24   some of the same type of criteria when he
25   decided to grant Dave a date.  Because I think
26   he recognized there was an awful lot of things
27   going on back in his life prior to the

40

1   commitment offense that were favorable and we
2   would ask you to consider those again. Post-
3   conviction wise, rather than re-addressing
4   everything that has already been stated,
5   big picture-wise what you see is an individual
6   who is striving to improve himself. And it
7   really doesn't matter what area you're referring
8   to he's making a concerted effort to improve
9   himself, whether it's in self-help, whether it's
10  in vocational skills, whether it's education.
11  It doesn't really matter where it's at he's
12  trying to improve himself. And I think that
13  would bode well for somebody that were to be
14  released back out on the streets. With regard
15  to the psychological evaluations, if you look at
16  evaluations I would submit that every single one
17  of them in some respect favors release. Even
18  was back to 1990. Going through his Cat-T and
19  his Cat-X all of the evaluations make reference
20  to the fact that there's a -- that in many
21  respects this was an isolated incident. That
22  this was not something that was going to happen
23  again. As long as he had the wherewithal and
24  the help he needed to understand some of the
25  underlying factors, which I think he has
26  addressed, that he would not be a threat. And I
27  think you see that consistently in all of his

1    evaluations up until today.  And they're getting

2    better and better as they go along.  In fact now

3    he is considered to be a minimal risk as stated

4    by Doctor Petracek is, I think, a favorable

5    statement.  And again I'm not going to go

6    through all of them.  But we have them outlined

7    there in his synopsis and they're all in your

8    file there.  They all in my opinion would favor

9    release.  We're going back many, many years.  Of

10   note, he's only got that one disciplinary and he

11   has nothing for violence since he's been

12   incarcerated.  If one of the concerns about this

13   Board is whether he's a violent individual, I

14   think that would bode well for his release as

15   well.  Educationally he has an awful lot of

16   units.  He's almost to his BA.  I think he has

17   116 or so units.  So he's well on his way to

18   getting his BA degree.  He's already got his AA.

19   And as you are probably well aware it is very

20   difficult for many individuals to get their GED

21   in these institutions.  But he's gone beyond

22   that and he has received his AA and he is well

23   on his way to getting a BA degree.  He has

24   viable parole plans as already noted at the

25   outset of this hearing where he is living with

26   his family.  I understand concerns about age of

27   parents and things of that nature.  But he does

```
 1   have money.  And there is nothing to preclude
 2   his family from giving him a house or somehow
 3   taking care of him if they were both to die.
 4   That wouldn't be an issue.  And he does have his
 5   brother as well.  So I understand that he is
 6   concerned about, you know, where is he going to
 7   live, but I think he has a lot of backup.
 8   available to him if that was a concern.  He has
 9   marketable skills, he is well educated, he's a
10   smart guy and he would succeed.  He's been
11   receiving one-year denials, Commissioners, since
12   1993, since his first one, his first hearing.
13   Every single year he gets a one-year denial.
14   And I would just ask at some point maybe we
15   should think bout giving him the opportunity to
16   get out there and see if he can succeed.  One-
17   year denials year in and year out I think in
18   some respects can actually be destructive if it
19   keeps up.  And I think he is doing everything he
20   can to comply with what you request of him and
21   he is just asking for the opportunity to go back
22   out there and give him the chance to be
23   productive.  Make amends for what he did.  And
24   he is not going to be able to do that without
25   your help.  So he is suitable and I will submit.
26          PRESIDING COMMISSIONER WILLIAMS:  Okay.
27   Do you have anything to add to what your counsel
```

 1    said or are you satisfied with his statement?
 2         **INMATE HART:** No, I would like to give a
 3    statement. Would that be all right?
 4         **PRESIDING COMMISSIONER WILLIAMS:** Sure.
 5         **INMATE HART:** I would like to express my
 6    deeply felt, genuine sorrow and remorse over
 7    causing Michael's death, a crime for which I
 8    alone am completely responsible, and for which I
 9    take complete responsibility. I understand that
10    my crime had a profound, tragic and lasting
11    impact on everyone that it affected. No one
12    suffered a more immeasurable loss than his
13    mother and father. A parent can suffer no
14    greater loss than the loss of a son or daughter,
15    especially if that, if it happened suddenly and
16    unexpectedly. I will be forever sorry to them
17    for being responsible for their loss and for
18    inflicting on them an incalculable amount of
19    pain and suffering, which they will continue to
20    endure all their lives because of what I did to
21    their son and to them. I am also sorry to
22    Mike's brother and all his relatives, especially
23    his aunt, uncle and cousin who he was living
24    with in Fresno. I regret that they had to
25    experience his disappearance, the finding of his
26    body, the funeral and my subsequent trial. I am
27    also sorry to Della and her family for the loss

44

 1    they experienced because of me.  Della is a good

 2    person and I regret having subjected to all the

 3    grief that she suffered.  I made my parents

 4    suffer as well because of what I did to Michael.

 5    I watched my mother's hair turn gray from worry

 6    through my arrest, trial and conviction.  I just

 7    learned recently from my brother that my father

 8    had never been the same since this happened.  He

 9    had lost all motivation.  Hearing that hurt me a

10    lot because my father and I are very close.

11    They raised me to be a kind, considerate human

12    being.  I regret letting them down and for the

13    impact my crime had upon them and for the shame

14    and humiliation that I brought upon our family,

15    for which I am truly sorry.  I am also sorry to

16    society for taking away a valuable member that,

17    could have done great things and to everyone in

18    the criminal justice system that had to be a

19    part of my crime and punishment.  Since coming

20    to prison I believe the record reflects my

21    commitment to better myself as a human being.  I

22    participated in everything that has been

23    available to me so that I can cope with

24    situations in a non-destructive, peaceful

25    manner.  My purpose since coming to prison has

26    always been to grow, mature and to develop the

27    coping skills and proper moral direction

45

1    necessary for me to be a law-abiding,

2    successful, productive and contributing member

3    of society. Never again will I do anything for

4    which society will find it necessary for me to

5    be removed from it. I am completely committed

6    to being a good citizen. This event could never

7    occur again because over the past 24 years my

8    beliefs and sense of moral responsibility have

9    been strengthened to such an extent where it is

10    never acceptable to me to use violence to harm a

11    fellow human being. It is never acceptable to

12    get what you want at someone else's expense. If

13    I am placed in a similar situation in the future

14    when a woman -- where a woman in a relationship

15    leaves me or leaves me for another man then I'll

16    do things completely different than I did back

17    in 1982. The first thing that I would do is to

18    respect her decision, I have to let her go. I

19    realize that I cannot control another person.

20    What she does is beyond my control. I won't be

21    in denial but I will move as quickly as possible

22    to accept the loss. I would also sever contact

23    with her so that I can move forward with my life

24    and find someone new. If I am suffering and

25    happen to have unresolved feelings over the

26    breakup, which I don't anticipate, I won't

27    hesitate to discuss my situation with my friends

46

1   and family.  I am ready to go home and be a

2   loving, caring member of my family.  I am ready

3   to be a responsible citizen.  I am ready to

4   begin to give back to the community in any way I

5   can and spend the rest of my life trying to make

6   up for someone that can never be replaced, and

7   that's Michael Inperatrice.  Thank you.

8          **PRESIDING COMMISSIONER WILLIAMS:**  Okay,

9   so it's 4:35.  We'll be in recess.  We'll call

10  you back when we have a decision.

11                    **R E C E S S**

12                    --oOo--

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

1       **CALIFORNIA BOARD OF PAROLE HEARINGS**

2              **D E C I S I O N**

3       **DEPUTY COMMISSIONER MARTEL:**  Okay, we're

4  back on record.

5       **PRESIDING COMMISSIONER WILLIAMS:**  Okay,

6  Mr. Hart, the panel reviewed all the information

7  received from the public and relied on the

8  following circumstances in concluding that you

9  are suitable for parole and would not pose a

10  risk of unreasonable risk of danger to society

11  or a threat to public safety if released from

12  prison.  There are many reasons.  One is you had

13  no criminal record of assaulting others.  You

14  had a stable social history as exhibited by

15  reasonable and stable relationships with others.

16  While in prison you have enhanced your ability

17  to function within the law upon release through

18  participation in educational programs,

19  institutional job assignments, self-help and

20  therapy and vocational programs.  You committed

21  the crime as a result of significant stress in

22  your life.  You lacked a significant criminal

23  history of violent crime.  Because of

24  maturation, growth, greater understanding and

25  advanced age we feel that that reduced the

26  probability of recidivism.  You had realistic

27  **DAVID HART  C-70436   DECISION PAGE 1   08/17/06**

1    parole plans including a job offer and family
2    support.   You have maintained close family ties
3    while in prison via letters and visits.   You
4    have maintained positive institutional behavior,
5    which indicates a significant improvement in
6    self-control.   You show signs of remorse and
7    that indicated that you understand the nature
8    and magnitude of the offense and accept
9    responsibility for your criminal behavior.   And
10   another reason would be the District Attorney's
11   Office of Fresno County was present at the
12   hearing and did not oppose parole.   The
13   psychiatric evaluation dated November the 1st of
14   2005 by Dr. Petracek, P-E-T-R-A-C-E-K, is
15   favorable.   The doctor states there is minimal
16   risk to the public if you are released and
17   states that your history at CDC relating to
18   disciplinary record attests to the stability and
19   sound decision-making responsibility.   In
20   addition the psychiatric report by Dr. P-E-S-A-
21   V-E-N-T-O of June the 5th, 2000 states that
22   there is -- Potential for violence if released
23   is well below average as there are no precursors
24   to violence that the doctor could see.   And that
25   was in the year 2000.   The panel found that
26   there are aggravating circumstances in that the
27   **DAVID HART   C-70436   DECISION PAGE 2   08/17/06**

1    victim was particularly vulnerable and the

2    prisoner went to great lengths to hide the body

3    after the, after the crime.  The panel assesses

4    a base term of 254 months, which according to

5    the matrix is in category III section C.  And we

6    placed it in the high end of that range at 254

7    months.  The additional 24 months for the

8    enhancement, the weapons charge, equals 276

9    months.  Post-conviction credit is given at four

10   months per year from August the 1st, 1983 to

11   August the 17th, 2006, that equals 88 months,

12   for a total period of confinement of 188 months.

13   The special conditions of parole are that you

14   not use alcohol, that you submit to alcohol

15   testing, and that you submit to THC testing as

16   you received a 115 while in prison for

17   possession of marijuana.  Mr. Hart, I hope you

18   understand that this is an expression of

19   confidence in your future behavior by this

20   panel.  As you well know this decision goes

21   before the full Board of Parole Hearings and

22   then it goes to the Governor of the State of

23   California.  At each of those venues this could

24   be changed.  I will be at the meeting whenever

25   it is considered by the Board of Parole Hearings

26   and will support the decision made by this

27   **DAVID HART  C-70436   DECISION PAGE 3   08/17/06**

50

1   panel.  That doesn't mean that the Governor is

2   going to approve it.  Hopefully he will look at

3   the record and have the same confidence in your

4   future that this Board, this panel has expressed

5   and the Office of the District Attorney of

6   Fresno County.  So do you have anything further?

7           **DEPUTY COMMISSIONER MARTEL:**  Yes, just

8   remember that it's going to take some time to

9   have all of this resolved and you need to

10  continue doing everything that you're doing now

11  and don't let anything let you backtrack or

12  slide.  So anyway.

13          **INMATE HART:**  Thank you very much.

14          **DEPUTY COMMISSIONER MARTEL:**  Good luck to

15  you.

16          **INMATE HART:**  I won't let you guys down

17  at all.

18          **PRESIDING COMMISSIONER WILLIAMS:**  Okay,

19  we hope not.  All right.

20          **INMATE HART:**  Thank you.

21          **ATTORNEY GUNNING:**  Thank you.

22                      --oOo--

23  PAROLE GRANTED               PENDING REVIEW

24  THIS DECISION WILL BE FINAL ON:  AND APPROVAL

25  YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT

26  DATE, THE DECISION IS MODIFIED.

27  DAVID HART  C-70436   DECISION PAGE 4   08/17/06

51

CERTIFICATE AND
DECLARATION OF TRANSCRIBER

I, RAMONA COTA, a duly designated
transcriber, PETERS SHORTHAND REPORTING, do
hereby declare and certify under penalty of
perjury that I have transcribed tape(s) which
total two in number and cover a total of pages
numbered 1 - 50, and which recording was duly
recorded at CORRECTIONAL TRAINING FACILITY,
SOLEDAD, CALIFORNIA, in the matter of the
SUBSEQUENT PAROLE CONSIDERATION HEARING of DAVID
HART, CDC NO. C-70436, on AUGUST 17, 2006, and
that the foregoing pages constitute a true,
complete, and accurate transcription of the
aforementioned tape to the best of my ability.

I hereby certify that I am a
disinterested party in the above-mentioned
matter and have no interest in the outcome of
the hearing.

Dated September 5, 2006, at Sacramento
County, California.

RAMONA COTA
TRANSCRIBER
**PETERS SHORTHAND REPORTING**

# EXHIBIT B

Jacoster

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF FRESNO**

1100 Van Ness Avenue, P.O. Box 1628

Fresno, California 93717

| FOR COURT USE ONLY |
| --- |

**PEOPLE OF THE STATE OF CALIFORNIA**

DEFENDANT: DAVID BRYAN HART        [X] Present    [ ] Not Present

| [X] JUDGMENT OF COMMITMENT TO: | [XX] STATE PRISON  [ ] COUNTY JAIL |
| --- | --- |
| [ ] ORDER GRANTING PROBATION | [XX] AND MINUTE ORDER |

CLK 3008.00 EO8-70 R05-76

CASE NUMBER:
**288486-4**

| Date of hearing:<br>7/22/83 | Dept. No.: | Judge:<br>BLAINE PETTITT | Clerk: NANCY<br>HOWARD | Reporter:<br>CYNTHIA GARZA |
| --- | --- | --- | --- | --- |
| Counsel for People:<br>GARY HUSS | | Counsel for defendant:<br>WILLIAM SMITH | | Probation Officer:<br>TOM CHARNOCK |

1. Defendant was convicted of the commission of the following crime on (Date): . . . . . . . . . . .

| Count | Code Section | Crime | | Degree | By Jury, Court or Plea (Specify) |
| --- | --- | --- | --- | --- | --- |
| 1 | PC 187 | Murder | | 2nd | Jury |

2. Defendant [ ] was arraigned [x] waived arraignment for judgment.
3. The court, having read and considered the probation report and no legal cause having been shown why judgment should not be pronounced
   a. [X] Sentences defendant to State Prison for the term prescribed by law. To run consecutive to PC 12022.5 enhancement.
   b. [ ] Specifies, pursuant to Pen. C. 1202b, the minimum term of imprisonment shall be six months as to count: . . . . .
   c. [ ] Sentences defendant to County Jail for the period of (Specify number of days): . . . . . . . . . . .
   d. [ ] Suspends imposition of sentence and defendant is placed on probation for the period of: . . . . . .
      [ ] upon conditions set forth in attachment 3d.
4. [ ] Defendant, convicted of more than one count, shall
   a. [ ] serve the sentence as to each count as follows:

| Count | Consecutive With | Concurrent with |
| --- | --- | --- |
| | | |

   b. [ ] serve the counts made consecutive in the following order:

5. Defendant shall serve this sentence with respect to any prior uncompleted sentence    a. [ ] concurrently.    b. [ ] consecutively.
   c. [ ] as set forth below or in attachment 5c.

6. Execution of sentence is
   a. [ ] stayed on the following count: . . . . . . . . . . . pending appeal, with the stay to become permanent when the sentence is completed as to count: . . . . . . . . . . .
   b. [ ] suspended and defendant is placed on probation for the period of: . . . . . . . . . . .
      [ ] upon conditions set forth in attachment 6b.
7. [ ] No allegation to enhance punishment was made in count: . . . . . . . . . . .
8. [ ] It was alleged
   a. [ ] Defendant was armed with a deadly weapon at the time of the commission or attempted commission of the crime charged in count: . . . . . . . . . . .  [ ] and allegation stricken as to count: . . . . . . . . . . .

**(Continued on reverse side)**

This form satisfies the requirements of Penal Code 1213.5 (Abstract of Judgment and Commitment). Singular includes the plural. This form is to be used in judgments other than death. A copy of probation report shall accompany this form pursuant to Penal Code 1203c and a copy of any supplementary probation report shall be transmitted to the Department of Corrections. Attachments may be used but must be incorporated by reference.

Form Approved by the
Judicial Council of California
Effective July 1, 1976

**JUDGMENT-COMMITMENT**

Pen C. 644, 969c, 969d, 1203, 1213.5,
3024, 12022, 12022.5.

b. ☐ Defendant used a firearm in count: . . . . . . . . ☐ and allegation stricken as to count: . . . . . . .

c. ☐ Defendant was armed at the time of arrest with a concealed deadly weapon within the meaning of Pen. C. 3024
☐ and allegation stricken.

d. ☐ Other (Specify and indicate if stricken): . . . . . . . . . . . . . . . . . . . . . . . . .

9. ☐ The Court finds the defendant

a. ☐ was armed at the time of commission or attempted commission of the crime with a deadly weapon within the meaning of

(1) ☐ Pen C. 3024 as to count: . . . . . . . . . ☐ but strikes the finding as to count: . . . . . . .

(2) ☐ Pen C. 12022 as to count: . . . . . . . . . ☐ but strikes the finding as to count: . . . . . . .

(3) ☐ Pen C. 1203 (Specify weapon):
as to count: . . . . . . . . . . . . . . . ☐ but strikes the finding as to count: . . . . . . . . .

b. ☐ was *not* armed at the time of commission or attempted commission of the crime within the meaning of

(1) ☐ Pen C. 3024 as to count: . . . . . . . .

(2) ☐ Pen C. 12022 as to count: . . . . . . . .

(3) ☐ Pen C. 1203 as to count: . . . . . . . .

c. ☒ *did* use a firearm as to count: 1. pur. 12022.5 PC. ☐ but strikes the finding as to count: . . . . . .

(1) ☐ The use was one use for the following counts: . . . . . . . . . ✗✗✗✗✗✗✗✗✗✗✗✗✗✗
✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗✗

d. ☐ *did not* use a firearm as to count: . . . . . . . . . .

e. ☐ was armed at the time of arrest with a concealed deadly weapon within the meaning of Pen. C. 3024 ☐ but strikes
the finding.

f. ☐ was *not* armed at the time of arrest with a concealed deadly weapon within the meaning of Pen. C. 3024.

g. ☐ Other (Specify and indicate if stricken):

10. ☐ Prior convictions which affect defendant's sentence were alleged and disposed of ☐ as follows    ☐ as set forth in
attachment 10.

| Conviction date | Jurisdiction | Crime and code Section | Applies to Count | Disposition |
|---|---|---|---|---|

**The Court finds within G.C. 13960/13967 crime is one of violence.
Informed Defendant, as required by PC 1170(c), that as part of the
sentence after expiration of the term the defendant may be on parole
for a period as provided in PC 3000.**

11. The court finds defendant   a. ☐ is   ☐ is not an habitual criminal under Pen C. 644a.

b. ☐ is   ☐ is not an habitual criminal under Pen C. 644b.

12. The court pronounced sentence on (Date): . 7/22/83 . . . . . and defendant was held in custody, through and including
the date of pronouncement of sentence for (Total no. of days): . 337 . . . . . as follows

| Count | Time other than Dept. of Corrections | Dept. of Corrections Time |
|---|---|---|

**225 actual time and 112 good time to be applied to the enhancement.**

13. Defendant is remanded to the custody of the Sheriff

a. ☐ For the period of (Specify no. of days): . . . . ☐ upon conditions and recommendations set forth in attachment 13a.

b. ☒ To be delivered   ☐ at the earliest convenient time   ☐ after 48 hours, excluding Saturdays, Sundays and holidays
[Pen C. 1203c] into the custody of the Director of Corrections at

(1) ☐ California Institution for Women—Frontera    (3) ☐ California Institution for Men—Chino

(2) ☒ California Men's Facility—Vacaville    (4) ☐ Other:

14. ☐ The court requests a copy of the diagnostic study and recommendations as provided in Pen C. 1168.

15. The court advised defendant of all appeal rights as required in CRC Rule 250 and defendant acknowledged understanding them.

16. ☐ Other (See attachment 16)

Dated: July 25, 1983 . . . . . . . . . .    _____
(Type or print name)    (Signature of Judge of the Superior Court)

TOTAL NO. of boxes checked: _____

**CLERK'S CERTIFICATE**
I hereby certify that the foregoing is a correct copy of the original on file in my office.

Clerk of the superior Court

[Seal]    By _____ Deputy

2

# EXHIBIT C

# MENTAL HEALTH EVALUATION
## FOR THE BOARD OF PRISON TERMS
## DECEMBER 2002 CALENDAR
## California State Prison - R.J.Donovan

## LIFER PROGRAM UNIT

### PSYCHOSOCIAL ASSESSMENT

## I.    IDENTIFYING INFORMATION

| | |
|---|---|
| Inmate Name: | David Hart |
| CDC Number: | C 70436 |
| DOB: | 8/17/60 |
| Evaluation Date: | 9/18/2002 |
| BPT Calendar Date: | December 2002 |
| Controlling Offense: | Second degree murder (firearm) |
| Date of Offense: | 6/1/82 |
| Sentence: | Base Term - 15 years to life |
| | Enhancements - 2 years |
| | Total Term - 17 years to life |
| County of Offense: | Fresno |
| Date Entered CDC: | 8/1/83 |
| CDC Evaluator: | Elaine L. Mura, Ph.D. |
| Location of Inmate at Time of Evaluation: | California State Prison R.J.Donovan |

## II.    SOURCES OF INFORMATION

Mr. David Hart, prisoner CDC number C-70436, was interviewed at California State Prison - R.J.Donovan on 9/18/2002. Prior to the interview, his Central File and Unit Health Record were reviewed by the undersigned. The following information is a composite of information from these records and Mr. Hart's statements during the interview. Mr. Hart was informed that the interview was not confidential and that a report with the results of the evaluation would be submitted to the Board of Prison Terms (BPT). Mr. Hart signed a statement acknowledging his understanding of this. The inmate appeared to understand the nature of the evaluation and the possible consequences of the interview to the best of his ability. For reasons not limited to the possibility that an individual being evaluated may have a mental disability or condition which may qualify under the Americans with Disabilities Act, the evaluation was conducted by a licensed psychologist. Also, it is my conclusion that it was not necessary to provide auxiliary aids or assistance to achieve effective communication.

INMATE COPY

1

## III.   BACKGROUND INFORMATION

### A.   DEVELOPMENTAL HISTORY

Mr. Hart was born in Santa Monica, California; he indicated that he was adopted and had very limited information about his perinatal period. He was unaware of any perinatal complications and denied any specific developmental disabilities.

### B.   EDUCATION

Mr. Hart attended kindergarten through the sixth grade in public schools in Puerto Rico, where his father was working; Spanish was spoken in school. He indicated that he earned satisfactory marks and was a good student without behavior problems. When he was 12 years old, the family moved from Puerto Rico to Morro Bay, California, where he attended junior high school for the seventh and eighth grades. He stated that he initially had some difficulty with English language classes but eventually earned good marks without behavior problems. When he completed the eighth grade, the family moved to Fresno, California, where he attended school from the ninth grade through college. In senior high school, he said that he earned B's and C's without behavior problems. In 1978, he graduated from high school: "First I got a job...then I went to college a year and a half later...I went to Fresno City College majoring in accounting and business...in '86 I got an AA with honors in general studies from San Joaquin Delta College from taking night courses while I was at DVI...I have more than 40 credits...now I'm taking correspondence classes in accounting from Indiana University." Prior evaluations noted an AGCT IQ in the bright normal range and California Achievement Test grade levels of 12.9 in reading and 12.5 in arithmetic.

### C.   FAMILY HISTORY

Mr. Hart indicated that he was born to a young unmarried couple who were college students. Records indicated that his mother was a student at Mills College and his father was a student at Stanford University: "My mother was in college...she wanted it to be a secret... her parents were from Indiana and they didn't know...my father was a college student too...I was adopted at birth...I always knew I was adopted...they told me when I was very young." Currently he indicated that his adoptive family consisted of his parents and one brother who was 1 1/2 years older and also adopted. He described his family as "close...we did a lot of things together...I lived with my family until I was arrested." His adoptive family members lived in Wasco, California, until he was three years old and they relocated to Puerto Rico. His adoptive mother was a housewife, while his adoptive father was "a chemical engineer but he didn't have a degree." Records from 1994 noted that his adoptive father worked in chemical plants in public relations or management, that his mother had held a variety of jobs when her children were young, and that his mother and father eventually ran a sales representative business together. As a child, Mr. Hart described himself as "a good kid... I had friends...I got a couple of spankings, but nothing

2

much...I spoke English and Spanish because we lived in Puerto Rico when I was young."
When he was 12 years old, the family returned to the U.S., where they lived in Morro
Bay, California, for two years before settling in Fresno, California. He denied any history
of abuse or gang activities. In the 1983 POR, he indicated that his brother was on
probation in Los Angeles "for an unknown offense." Later reports noted that his brother
had married and lived with his wife and three children.

Mr. Hart described his relationship with his adoptive mother as he was growing up as
"pretty close...I was a mamma's boy...I was closer to my mom than my dad because I had
more exposure to her...now she lives in Fresno...we talk on the phone once a week...she
visits once a year...we don't write letters." He said that his relationship with his adoptive
father as he was growing up was "good...he worked...we would do things together...he
was the disciplinarian in the home...now he lives in Fresno with my mother...I see him and
talk to him on the phone like my mother." He indicated that his relationship with his
adoptive brother was "not real close...there was sibling rivalry...he was jealous of the new
kid...he picked on me a lot as I got older...he wasn't real nice...now he lives outside of
Fresno...we're close now...I haven't seen him since '94, but he's coming in a couple of
weeks...they rejected him last year because of an unpaid ticket...we talk on the phone two
or three times a month...I talk to his three daughters too...they're seven to 13...I talk to my
sister-in-law too...we don't write letters either."

When asked about his criminal history, Mr. Hart stated that he was first picked up by the
police when he was 19 or 20 years old for being drunk in public: "I spent the night in
jail...then they sent me home." He was arrested for the controlling case when he was 21
years old.

Mr. Hart identified himself as Christian "but I haven't gone to services for a long time...I
used to read the Bible in the past." He reported that he has several leisure time activities
which he enjoys, including reading, watching television, doing leather work (especially
making belts), working out, socializing with a few friends, and studying. He said that he is
not easily bored when engaging in activities which he enjoys. From 1997 to the present,
he indicated that he has been participating in AA/NA. Records confirmed participation
since 1998 (with former participation in 1993). More recently, a chrono of 7/25/01 noted
participation in AA, while a chrono of 12/13/00 stated that he attended bi-monthly AA
meetings for the year 2000. Records also noted that Mr. Hart completed the Category X
program on 12/22/94 and the Category T program on 10/23/96. He attended multiple
therapy groups on a large variety of topics in 1994, 1995, 1996, 2001, and 2002. A 1996
report noted that he participated in KAIROS and CROP, which he self-initiated and self-
selected. Even earlier (1991 through 1993), he was a member of Toastmasters.
Chronos of 6/11/01 and 1/17/02 indicated that he completed Hands of Peace conflict
resolution workshops. Records also indicated that he took college courses while at DVI
from 1984 to 1986. It would certainly appear that Mr. Hart has taken advantage of
virtually every opportunity for self development available to him since at least 1994.

Inmate Name: David Hart    CDC Number: C 70436    Date of Evaluation: 9/18/2002    Page 4

## D.    PSYCHOSEXUAL DEVELOPMENT

Mr. Hart stated that his first sexual experience was at the age of 16 with a female peer on a one-time basis. He reported that he has had four sex partners, including his first, two females that he was casually dating, and the victim's girlfriend in the controlling case (who was apparently his longest and most significant relationship). He denied any history of soliciting prostitutes, pimping, group sex, homosexuality, or sexually aggressive behaviors.

## E.    MARITAL/RELATIONSHIP HISTORY

Mr. Hart has never been married, has had no live-in relationships, and has no children. At the present time, he said that he has no girlfriend.

## F.    MILITARY HISTORY

Mr. Hart has never served in the U.S. Military forces.

## G.    EMPLOYMENT/INCOME HISTORY

Mr. Hart indicated that his first summer job as a restaurant cook was at the age of 16. When he was 18 years old, he worked full time in a wood factory for ten months. While on the job, he cut his hand severely on a wood saw, received worker's compensation, and had five surgeries over the course of 1 1/2 years. When he was 19 years old, he said that he worked full time for one year doing janitorial and delivery tasks at a carpet and flower shop. At the age of 20, he stated that he worked full time for eight months delivering automobile parts. When he was 21 years old, he indicated that he was the manager of an ice cream store of eight to nine months (until his arrest). Apparently, he has remained in contact with his employer from that time period and plans to return to similar employment should he parole.

At the present time, Mr. Hart has been working in CMT Blues, a joint venture tee shirt factory, since October 1996. Before that, he reported that he worked in the canteen, in PIA furniture production control, as a cook, at CMT Blues (two years in the past before his current assignment), and in vocational upholstery. He completed a vocational certificate in upholstery on 6/11/96.

According to work supervisor reports, Mr. Hart has received exceptional work ratings on 12/01, 9/01, 6/01, and 3/01 (line feeder), 12/00 (quality control), and 3/00 (sewing). For the past ten years, he has been receiving above average to exceptional work ratings. Clearly, he has an exemplary work history.

4

Inmate Name: David Hart      CDC Number: C 70436      Date of Evaluation: 9/18/2002      Page 5

## H.    SUBSTANCE ABUSE HISTORY

Mr. Hart said that he began to drink alcohol at the age of 17 or 18 and described himself as a light to moderate drinker. He said that he started to use marijuana at age 11 and indicated that he was a light user "on and off" until 1986. It should be noted that he indicated during the interview that he was both drinking alcohol and smoking marijuana around the time of the controlling offense.

## I.    MENTAL HEALTH AND MEDICAL HISTORY

Mr. Hart reported that his health, hearing, appetite, and sleep are good. He wears reading glasses. At the present time, he takes no medications. He denied any history of serious illnesses. When he was 17 years old, he said that he was run over by a motorcycle while racing with loss of consciousness but no treatment. When he was 18 years old, he suffered the work-related hand injuries noted above: "I almost cut my fingers off...they did five surgeries on my left hand and one on my right hand...I had one hernia surgery in prison too." ·

When asked about his mental health history, Mr. Hart denied any mental health treatment, psychiatric hospitalizations, or psychotropic medication. It should be noted that he was a participant in both the Category X and Category T programs while incarcerated.

### 1994:  Category X Program

On 11/4/94, a Category X Psychological Evaluation was done in which Mr. Hart was administered the Minnesota Multiphasic Personal Inventory (MMPI-2). His profile was valid, although he did attempt to minimize or deny any psychological problems. The test results revealed that "inmate Hart is reasonably well adjusted, with no evidence of a thought disorder, affective disorder, or organic impairment...similar profiles tend to be quiet individuals...when, infrequently, sudden outburst do occur, they tend to come as a surprise to others...may display poor judgment under stress or when provoked...may be genuinely concerned about social problems and issues." When interviewed, Mr. Hart spoke freely and sincerely about the controlling offense and "demonstrated a most sincere, appropriate sense of remorse." Increasing insight and maturity were also noted. Dr. Calix proposed no Axis I or Axis II diagnosis. The report concluded that "his present violence potential is seen as being less than average, even in a less controlled structured environment."

A Category X Psychosocial Evaluation was also done on 9/19/94. M.S.W. Hanson stated that Mr. Hart appeared to have gained in maturity and was "at small risk for re-offending at this time;" she proposed no Axis I or Axis diagnosis.

5

Inmate Name: David Hart     CDC Number: C 70436     Date of Evaluation: 9/18/2002     Page 6

In the Final Category X Board Report dated 12/22/94, Dr. White analyzed Mr. Hart's motivation for the murder in the following way:

> "It appears to me that the central question in this case involved the explanation of how an individual with no discernible psychological impairment and who appears generally 'normal' in all other respects could respond in a homicidal fashion to a relatively common and adjustmental problem that most of us face at least once in our lives. The psychometric tests and psychosocial history are non-contributory to this point. During the detailed clinical examination for the preparation of this Category X report, a surprising parallel was discovered that calls for some explanation. According to the inmate's report, his biological parents were unmarried college students. When his biological mother became pregnant with him, the biological father urged marriage. His mother refused the marriage and ultimately the inmate was adopted out at birth. The inmate knew that he was adopted and was explained the circumstances of same. Years later, our inmate, in his first love relationship, was similarly turned down in his marriage proposal by his girlfriend. This may account, in part, for the obsessional connectedness with his ex-girlfriend that resulted in extremes of behavior including stalking and the homicide offense against his ex-girlfriend's new suitor."

The report further stated that "this is a bright, motivated inmate who is eager to learn more about interpersonal relationships and to explore the psychodynamics of his homicide offense." Category T participation was strongly recommended.

### 1996: Category T Program

The Category T Initial Evaluation and Treatment Plan dated 12/22/95 noted that Mr. Hart was endorsed for the Category Program on 8/10/95 and interviewed on 12/22/95. No signs or symptoms of a severe mental disorder were noted, and no Axis I or Axis II diagnosis was proposed. Dr. Pesavento recommended that Mr. Hart participate in individual and group therapy while continuing his vocational and educational programming and self-initiated and self-selected self help groups (such as Kairos and CROP).

The Category T Clinical Summary dated 10/23/96 indicated that Mr. Hart participated in a large variety of groups, continued his vocational and educational programming, and continued participation in self-initiated and self-selected self help groups. During therapy, Mr. Hart was reportedly alert, attentive, and responsive; he also developed important insights regarding his family, himself, and the crime. He was able to deal with "his own insecurity and jealousy, his fear of looking at himself, issues related to abandonment and rejection, and his need for nurturance and to feel important." A key dynamic in his adoptive family was apparently handling problems independently without discussing them or seeking input from others; in addition, the report suggested that his adoptive parents offered only limited nurturance. The report concluded that "Mr. Hart indeed accepts full

Inmate Name: David Hart    CDC Number: C 70436    Date of Evaluation: 9/18/2002    Page 7

responsibility for his actions and expressed remorse for not only his victim but also the victim's family, his former girlfriend, and his own family as well...has achieved `a sense of remorse for failing himself'...he has programmed exceptionally well throughout the Category T program...violence potential has significantly decreased and is considered at this time to be well below average for this population."

Several prior BPT evaluations were present in Mr. Hart's Central File.

3/16/87

Dr. Loughlin stated that there was "no overt psychiatric illness." The report concluded that "mild to moderate positive psychiatric change has occurred in terms of continuing personality maturation...aggressive potential is diminished."

5/28/90

Dr. Krepps-Hess deferred any diagnoses. The report stated that "his guilt is a debilitating force in his life and will require psychotherapy to resolve...there is a strong obsessional quality about his attachment to (his girlfriend)." Referral to the Category X program was recommended.

10/1/92

Dr. Kotila proposed the diagnosis of other life circumstance problem: "The committing offense was mostly related to subject's temporary emotional reaction to the breakup of his relationship with Della and his over-reaction to her new boyfriend...appears to have been a crime of jealousy...tragic and brutal act appears to have been an isolated incident...represents his insecurity, immaturity, and self-centeredness...nowadays he appears to have matured considerably and have much more insight into himself and into his past behavior...violence potential...is estimated to be below average both within prison and when released."

10/18/93

Dr. Kitt proposed the diagnosis of adjustment disorder with disturbance of conduct (in remission). The report also stated that "he has psychiatrically improved moderately...in a less controlled setting...violence potential outside of a controlled setting in the past is considered to have been average, and at present is estimated to be decreased." Referral to the Category X and/or the Category T program was recommended.

2/2/95

Dr. Henry proposed no Axis I or Axis II diagnosis. The report concluded that "his violence potential in the community is considered quite low at this time."

## 5/16/96

Dr. Henry's diagnostic conclusions remained unchanged. The report added that Mr. Hart began the Category T program on 12/22/95, where he completed several self help groups. Finally, it was concluded that "his present violence potential is less than average."

## 11/21/96

Dr. Pesavento indicated that Mr. Hart completed the Category T program; he also stated that he agreed with the conclusions of the final Category T report.

## 9/25/97

Dr. Adam proposed no Axis I or Axis II diagnosis. The report noted that Mr. Hart's description of the crime during the interview - in which he declared that the murder was not premeditated but instead accidental while the two men were struggling for the gun - was far-fetched: "Most people with the intellectual ability required to get into college would know the difference between trying to scare or intimidate somebody and shooting them several times in the head...likewise, if somebody is accidentally shot, you rush them to a hospital, not to a canal." The report concluded that "if he does successfully get a release date, it is unlikely that he would resort to such a foolish and irrational crime again...his very exemplary behavior in prison is also a very positive prognostic sign that he can handle human relationships in a positive manner."

## 9/10/98

Dr. Singer proposed no Axis I or Axis I diagnosis. The report also stated that "Mr. Hart has psychiatrically improved greatly...has programmed in an exemplary fashion...in a less controlled setting, the inmate is likely to continue improvement."

## 12/10/98

This report was an addendum to the 9/10/98 report done by Dr. Singer. Dr. Pesavento stated that "there is little to add to that which has previously been documented...the previous examination and psychological reports are still accurate and valid."

## 6/5/00

Dr. Pesavento proposed no Axis I or Axis diagnosis. The report also indicated that "Mr. Hart continues to remain a stable individual committed to his work, studies, and family...potential for violence outside a controlled setting in the past is considered to have been average...at present...it is considered to be well below average...no significant risk

Inmate Name: David Hart        CDC Number: C 70436        Date of Evaluation: 9/18/2002        Page 9

factors or precursors to violence that this write can foresee at this time."

## IV.    PLANS IF GRANTED RELEASE

If granted release, Mr. Hart reported that he plans to live in Fresno with his parents:  "I have some money saved...I could get my own apartment...and I have a job waiting for me...he's my mentor...he's an ice cream distributor...he's paying for my college classes...I would work in the office or deliver locally...I have letters for everything."
Overall, Mr. Hart's parole plans appeared feasible and appropriate.

## V.    CLINICAL ASSESSMENT

### A. CURRENT MENTAL STATUS/TREATMENT NEEDS

Mr. Hart presented as a mildly obese Caucasian male of 42.  He is six feet tall and weighs 240 pounds.  His hair was curly with slight graying at the temples.  His grooming was good.  During the interview, Mr. Hart was personable, pleasant, and cooperative.  His speech was clear; and his thoughts, focused.  He was soft-spoken and presented as quiet and thoughtful.  His mood and affect were within normal limits.  Mr. Hart was oriented x 4 with an average fund of general information.  His thinking ranged from somewhat concrete to relatively abstract.  His short-term auditory memory was good, as was his ability to do simple calculations in his head.  His responses suggested variable judgment under stress.  Although he might pinpoint the factors relevant to appropriate decisions, he seemed unable to figure out adequate solutions.

Mr. Hart denied any past or present auditory or visual hallucinations.  He also denied any current depression or suicidal ideation.  From his description, past bouts of depression appeared to be situational in nature.  He denied any history of suicidal ideation or attempts.  He also denied any past or present homicidal ideation.  Mr. Hart described himself as "friendly...depending on their demeanor...if they come across as unfriendly, I avoid them...I don't go out of my way to make friends...in school, I'd be around people, so I'd make friends...I made friends real easy outside...I like people...I trust some people, but not implicitly...they have to build up trust...that's a prison thing...I didn't have a best friend when I was growing up...when I was with my girlfriend (controlling case), she was my best friend...now I don't have a best friend."  He denied any obvious paranoid ideation.

From his current presentation, Mr. Hart did not appear in need of psychiatric intervention.

### B. DIAGNOSTIC IMPRESSION

AXIS I        *Clinical Syndrome*
              V71.09  No diagnosis or condition on Axis I

AXIS II       *Personality Disorder*

9

Inmate Name: David Hart    CDC Number: C 70436    Date of Evaluation: 9/18/2002    Page 10

V71.09  No diagnosis or condition on Axis II

AXIS III    *Physical Disorder*
History of multiple, serious hand surgeries subsequent to a
work-related injury

AXIS IV    *Severity of Psychosocial Stressors*
Moderate to Severe (3-4):  Incarceration

AXIS V    *Global Assessment of Functioning 0-100*
Current GAF:  85

## VI.    CRIMINAL HISTORY/REVIEW OF LIFE CRIME

### A.  CRIMINAL HISTORY

According to available information, Mr. Hart has no juvenile criminal history.  His only
adult crime was the controlling case.

### B.  CONTROLLING OFFENSE

The following information was gathered from Mr. Hart's POR dated 7/15/83.  On 5/31/82
or 6/1/82, Mr. Hart fatally shot the 19-year-old male victim, his former girlfriend's current
boyfriend, apparently during a jealous interchange.   On 6/3/82, a California Highway
Patrol officer discovered an abandoned vehicle belonging to the victim, who had been
reported missing two days earlier.  Extensive blood stains in the interior of the vehicle
suggested foul play.  Sheriff's officers were summoned.  They followed a trail of blood
stains which led to a nearby bridge crossing a canal; the victim's body was found in the
canal. An autopsy revealed that the victim was killed by three .32 caliber bullet wounds to
the head.  When the victim's 19-year-old girlfriend was interviewed, she reported that she
first dated the victim on 4/27/82.  Three days later, she broke up with Mr. Hart, her former
boyfriend of a year and a half.  Mr. Hart reportedly did not take the break-up well and told
his former girlfriend on one occasion that he would kill the victim because "he stole you
away from me."  Mr. Hart also followed his former girlfriend and the victim and took
photographs of them with a telephoto lens. On 5/30/82, the victim and Mr. Hart's former
girlfriend visited the victim's parents' home, returning late in the evening.  The victim
dropped her off and was supposed to return to his aunt and uncle's home; however, he
never arrived.  From that point on, no one saw him; a few days later, a missing persons
report was filed.  At the time of the murder, Mr. Hart said that he was with a male friend;
however, his alibi witness subsequently admitted lying and reported that Mr. Hart
confessed the murder to him.  Mr. Hart's friend later told police that Mr. Hart said that he
had jogged to his former girlfriend's house, where he saw the victim's vehicle.  Mr. Hart
reported to his friend that he hid under a blanket in the back of the jeep until the victim
returned and drove away, when he confronted the victim.  The victim stopped the vehicle

10

in an orchard, and the two men began to argue. Mr. Hart stated that he then shot the victim twice in the back of the head; when the victim asked if he was dead, Mr. Hart shot him a third time. Mr. Hart then threw the body into the canal and drove away in the victim's vehicle, which he later abandoned. He told his friend that he threw his jogging outfit into a dumpster and buried the murder weapon. On 9/16/82, Mr. Hart was arrested. At that time, his father said that a .32 caliber pistol (the same as the murder weapon) was kept in the family home, where all immediate family members had access to it, but that it had been missing for several months. Mr. Hart chose not to make a statement for the POR.

When asked about the controlling offense, Mr. Hart made the following statement: "I had a pretty serious relationship with my girlfriend...I went with her for 1 1/2 years...she was kind of manipulative...she wanted to get married, and I dropped the ball...she figures I wasn't serious, but I was...I was just procrastinating...I met her through her brother...I was friends with him, and he introduced us...she wanted a proposal...it was more like an ultimatum...I didn't give her any indication about making a commitment...I figured what's the hurry...but I didn't tell her that...she was only 18, and she wanted to get married...there was this guy at City College that she was going to school with...he had been asking her out...he asked her to go to Monterey with him...I didn't pay attention because I thought our relationship was real secure...she broke up with me immediately after she said, `When are we getting married?'...right after having sex...I spent the night...the next morning, I said something about moving in together...she said she'd never do that...two weeks later at a concert she told me, `I think I found somebody else'...I was mad at her...I hadn't seen her for two days...she wasn't home...we spent the rest of the concert talking about it...it was a shock...I spent the night with her, but we didn't have sex...the next morning, she told me I couldn't see her naked anymore...she said she loved me but wasn't in love with me...we could be friends...I spent the next month trying to persuade her to come back...the first ten days, she dated the guy without sex...she gave me indications we could reconcile, so I persisted...after four weeks, I got the feeling she was being domineered by the guy but couldn't leave him...she said he wouldn't let her go...I figured the only way to get her back was to get Michael to stop seeing her...and the only way to do that was through force...I spent the weekend backpacking with her brother...she spent the weekend in Monterey with Mike...she told me he wanted to marry her...he was doing everything she wanted...I decided to confront him...I thought I needed some kind of leverage, so I took a pistol from my parents' home...it was my grandmother's pistol...she passed away...I thought of the pistol as a prop...I wanted to intimidate him...I called her, and she wasn't home...I got in my mom's car to go to her house...I stayed there for 15 or 20 minutes...then a car came and parked in front of her house...they stayed in the car making out for ten or 15 minutes...I saw them walking to the house...I got out of my mom's car and waited...he didn't return, so I got in his car...it had bench seats...I laid down on the floor in the back...I was getting scared...before I could make a decision, I heard the front door close...Mike ran and got in the car...he started it up and then he started singing with the radio...then I started thinking again...when we got to his house, I'd wait until he went inside...but I felt I needed to confront him...after a few miles, I raised

Inmate Name: David Hart    CDC Number: C 70436    Date of Evaluation: 9/18/2002    Page 12

up...I told him I needed to talk about Della...he said there was nothing to discuss...I held the weapon where he could see it...he looked at me and asked what I was going to do...he got angry...we were arguing...then he pulled over...he told me to get out of the car...that's when I shot him three times...he went limp...it happened pretty fast...I was terrified...I didn't detect any signs of life...I was pretty sure he was dead...I pushed him over and drove...I turned right and drove...I thought of the consequences...the paved road ended at a bridge...I threw his body in the canal and left his car near the bridge...I jogged back to Clovis...I had money in my pocket, so I went to a mini mart and got something to drink...then I called a taxi...I went to where I left my mom's car and went home...then I woke up the next morning...they knew it was me right away, but they didn't arrest me right away...I talked to a friend who was an attorney...I said a guy's missing...he told me to talk to him first...they searched my parents' house...I was arrested three months later...the crime was caused by my inability to deal with an emotional situation in a constructive manner...and not seeking help...I didn't talk about it with anybody...by bottling up everything inside, I came up with this idiotic plan...I was smoking marijuana and drinking alcohol a little bit around that time...it could have caused a judgment impairment...marijuana use makes you stupid...I regret what I did...I thought I was deeply in love and would spend my whole life with her...I thought she loved me and I loved her...she wanted to get married...if not me, then it could be somebody else."

## C. PRISON OFFENSES

Since his incarceration for the controlling offense, Mr. Hart has received only one 115 violation on 1/27/86 for possession of marijuana. He also received only one 128 counseling violation on 3/19/86 for window coverings in his cell. Clearly, Mr. Hart has not presented as a serious management problem while incarcerated.

## VII.    RISK FOR VIOLENCE

The current research literature indicates that an empirically-based approach is the most reliable and valid method for assessing risk for future violence. In the present evaluation, three separate psychological instruments were used to help estimate this individual's risk for future violence in the community. The information for scoring these instruments was obtained from both the clinical interview and the available records. These three measure are widely used and are supported by years of research. They have been cross-validated with various forensic populations, including United States males in correctional settings. However, the following results need to be regarded with some level of caution since some individuals may possess idiographic differences that could limit the applicability of these instruments. The Evaluator has taken these above factors into consideration in determining how much weight to give each of the three measures and in formulating an overall estimate for risk for future violence in the community. Estimates of risk for violence will be stated categorically - low, moderate, or high.

Employing the above information, three risk assessment instruments were done. On the

Inmate Name: David Hart          CDC Number: C 70436          Date of Evaluation: 9/18/2002          Page 13

Hare Psychopathy Checklist, Mr. Hart scored in the low range. When compared to the normed inmate population, his score placed him at the 2nd percentile - that is to say, 2 percent of normed inmates scored lower than he did, while 98 percent of normed inmates scored higher than he did. On items tapping into interpersonal and affective behaviors, he scored at the 14th percentile, which was also in the low range. On items tapping into impulsivity and social deviance, he scored below the 1st percentile, which was also in the low range.

On the Violence Risk Appraisal Guide (VRAG), Mr. Hart scored on the borderline between the low and moderate ranges of risk. Of nine possible categories, his score just barely placed him in Category 4.

On the HCR-20, Mr. Hart's overall score was in the low range. On items tapping into background and history, on items tapping into clinical presentation, and on items tapping into predictors of future risk, his scores were uniformly in the low range.

## VIII.    CONCLUSION

When asked why he felt that she should be granted a parole date, Mr. Hart made the following statement:

> "I don't know what adequate punishment is...I know I'll never commit another crime or become obsessed...I know the mistakes I made in the past...I know what to look for in myself...if I get depressed, I can seek professional help...I'd talk about it...I used to be scared of shrinks...now I know they can help you and counsel you...my main thought when I get out is my career and getting ready for retirement."

When asked what he would change if he could alter only one thing in his life, Mr. Hart replied, "My birth mother married my birth father...it would change everything...I love my adoptive parents, but it's nothing like that...you're missing something...your life was supposed to be different...when you're adopted, your mother and father definitely care about you...but your extended family doesn't care about you...not really...they might like you, but it's not the same...I can sense it...plus I would have been the first child for my real mother...my grandmother was somebody famous...I just had another thought...I didn't appreciate education in high school...I didn't get the connection of going to college...my friends didn't go to college...my dad and mom and brother didn't go to college...I didn't think I could be a professional and live well...in my other family, both my mother and father were going to college...and her parents went to Ivy League colleges." Mr. Hart's response suggested some insight into his personality dynamics; however, it also suggested some lingering grandiosity and the felt need to rationalize away negative background factors over which he in fact did have a choice.

Therefore, based on the above information, Mr. Hart presents with both positive and negative factors for parole. On the positive side, Mr. Hart has a current classification

score of zero (9/9/02), which he has maintained since 7/14/92 and which is consistent with a Level I placement. Except for the controlling offense, he had no juvenile or adult criminal history. In addition, since incarceration nearly 20 years ago, he received only one 115 violation and one 128 violation, neither of which was violent. While incarcerated, he completed his AA degree and is currently pursuing his BA degree in accounting from an accredited university. He completed one vocational certificate while incarcerated and is considered a critical worker by Joint Venture CMT Blues; he has also received above average to exceptional work ratings for the past several years. He maintains contact with his immediate family - and even with his former 1982 employer. His parole plans appeared to be feasible and appropriate. In the past, he was given a parole date, suggesting that BPT felt that he had fulfilled their requirements and that he would not present as a significant risk in the community if paroled. In fact, through the years, various professionals have indicated his low degree of risk - with the controlling case probably an isolated incident. On 7/1/96, he was granted parole, with a tentative date of 7/11/01; on 9/9/96, his parole date was rescinded by the Decision Review Committee.

Finally, on two of the three risk assessment instruments employed, Mr. Hart scored in the low range of risk. On the Hare Psychopathy Checklist, he did not present as a psychopath. Despite minor elements of grandiosity, lingering rationalization regarding the crime, and a tendency to alter the facts (probably based on his felt need to present well to the Board and others in his environment), in no way did he present as a psychopath. On the HCR-20, a dynamic measure of risk, he also scored in the low range of risk. His background/history was not generally consistent with the violent re-offender - nor was his clinical presentation. Although he may be exposed to destabilizers in the community (most especially the possibility of an obsessive love relationship) - as well as exposure to stress-inducing events after so many years in prison - there were no obvious striking indications suggestive of parole failure.

On the other hand, Mr. Hart did score on the borderline between the low and moderate ranges on the VRAG, an actuarial measure of risk. In other words, his profile just reached significance for a moderate risk of violent reoffense. However, given the absence of other potential triggering mechanisms (substance abuse, organic impulsivity, a history of chronic rage reactions, etc.), the risk for violence would seem to be minimized.

Following his BPT hearing on 5/29/01, it was recommended that he remain disciplinary free, continue to upgrade educationally, and participate in self help groups when available. From available information, it would appear that he has fulfilled the recommendations made. He has remained disciplinary free. He had continued to take courses towards his BA degree. He has participated in AA/NA groups and any self help/educational groups available.

Based on the above information, Mr. Hart would benefit from continuing his college education, remaining disciplinary free, and continuing his participation in AA/NA and any

Inmate Name: David Hart     CDC Number: C 70436     Date of Evaluation: 9/18/2002     Page 15

other self help/educational groups available. Of course, he could easily fulfill these goals in prison or in the community.

Elaine L. Mura, Ph.D.
Forensic Psychologist
Lifer Program/Forensic Services Unit
Health Care Services Division
California Department of Corrections

October 3, 2002
Date Signed

15

# RICHARD J. DONOVAN CORRECTIONAL FACILITY

# HEALTH CARE SERVICES

## PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS

### June 2000 Calendar

### PSYCHOLOGICAL ASSESSMENT

I.    **IDENTIFYING INFORMATION:**
Mr. Hart is a thirty-nine-year old single Caucasian male born on August 17, 1960. His religious preference is Protestant. There are no unusual physical characteristics nor does Mr. Hart currently subscribe to any particular nicknames or aliases.

II.   **DEVELOPMENTAL HISTORY:**
Mr. Hart does not relate nor remember any particular prenatal or perinatal concerns, nor does he admit to have any birth defects. He further states that there were no abnormalities nor where there any delays in developmental milestones. Furthermore, there were no obstacles or illnesses that prevented him from developing speech, language and motor skills within the normal time frames. Mr. Hart does relate, however, that he was adopted at birth. He was told that he was adopted at a young age by his adopted parents. He further relates that he had no difficulties relating to peers and, he was able to make friends easily. He further participated in family activities and engaged in various activities outside of school. His interests included golf, dirt bike riding, camping, swimming, baseball and snow skiing. There is no history of cruelty to animals, enuresis or juvenile fire setting. Furthermore, there is no significant medical history other than having contracted as a youngster both measles and chicken pox. There is no history of physical or sexual abuse either as a perpetrator or as a victim.

III.  **EDUCATION:**
Mr. Hart relates that he began kindergarten at age five and then entered first grade at age six. No particular academic problems were noted throughout his academic career. Mr. Hart holds an AA degree which he received in 1986. He further states, that he has over 100 credits and is working toward a bachelors degree in accounting. His grades range between average to above average. Mr. Hart relates that he did not have any particular academic challenges nor problems throughout his scholastic endeavors. He is not interested or involved in any other type of specific educational activities at this time.

**HART, DAVID**          **C-70436**          **F1-03-131L  GP/rs**

$1b$

**BOARD OF PRISON TERMS REPORT**
**PAGE 2**

IV.    **FAMILY HISTORY:**
Mr. Hart's adopted father is currently seventy-three-years of age and has not suffered from any type of mental illness or significant medical problems nor substance abuse. Mr. Hart's adopted father completed two years of college and held various positions with various companies over the years. Overall, Mr. Hart describes his relationship with his father as being very good. His adopted mother, age sixty-nine, was for a number of years a house-wife, however, when Mr. Hart was older she was employed as a secretary and later owned her own businesses. She completed high school. She has no history of mental illness or significant medical problems nor did she suffer from substance abuse. Both of Mr. Hart's adopted parents are currently retired. Mr. Hart has a forty-one-year old brother who also completed two years of college and is a salesman. No significant medical problems or legal problems are noted in his background. Mr. Hart also relates that he was close to his adopted grandmother, who died when he was approximately sixteen or seventeen years of age.

Mr. Hart relates, that he lived in Wasco for the first three years of his life and then moved to Puerto Rico for approximately nine years due to his father's employment. Upon termination of that employment, his family moved back to California where they have since resided. Mr. Hart lived with his parents until the age of twenty-two when he was arrested for the commitment offense. Overall, his relationship with his brother and parents has consistently been good and he does not note any type of conflict or disagreements between them. He further relates that they have been supportive of him throughout these many years of incarceration.

V.    **PSYCHOSEXUAL DEVELOPMENT AND SEXUAL ORIENTATION:**
Mr. Hart relates that he was aware of his body changing at approximately eleven to twelve years of age. He began dating at sixteen years of age and had his first sexual relationship at that time. There is no history of high risk behavior, sexual aggression of any type or any type of sexual disorder or dysfunction.

VI.    **MARITAL HISTORY:**
Mr. Hart has never been married nor have there been any children generated from any prior relationship.

VII.    **MILITARY HISTORY:**
Mr. Hart does not claim any military service.

**HART, DAVID**          **C-70436**      **F1-03-131L  GP/rs**

17

**BOARD OF PRISON TERMS REPORT**
**PAGE 3**

VIII.    **EMPLOYMENT AND INCOME HISTORY:**
While on the streets Mr. Hart had been employed with Cervelli distributors
for approximately one year. While in prison Mr. Hart has worked for
prison industries as a production scheduler for a factory which
manufactured, office furniture. He had been employed in this position for
approximately nine years. Currently, he is involved as a lead man in
production as well as a scheduler with CMT-Blues at this facility. He has
been employed in this position for approximately 3 1/2 years. Mr. Hart
does not note any type of public assistance or money management
program in the past. He further states, that his current employment
interest/aptitude lies in manufacturing.

VIIII.    **SUBSTANCE ABUSE HISTORY:**
Mr. Hart relates that between the ages of sixteen through twenty-two he
used marijuana on several occasions. He further notes, that at ages
nineteen through twenty-two, he had also used alcohol approximately one
time a week. There has never been any type of legal problems
associated with his usage of either substance. Further, he does not see
any current problems or needs in this area. He has, however, maintained
regular attendance at AA at this facility. As he states, he goes twice a
month, however, due to the absence of the civilian AA facilitator he has
only been able to attend approximately eight of twelve sessions during a
quarter.

X.    **PSYCHIATRIC AND MEDICAL HISTORY:**
Mr. Hart does not relate any previous psychiatric/psychological history.
Furthermore, his medical history is negative for any type of chronic or
acute illnesses or medical problems.

XI.    **PLANS IF GRANTED RELEASE:**
Mr. Hart's intention, should he be paroled, would be to live with his
parents in Fresno. He further relates that both his parents, brother and
sister-in-law along with friends would be supportive and helpful to him.
Currently he has approximately fifthteen thousand dollars in savings. He
further relates that he would go to work for the Patrick Cervelli distributors,
who was his employer at the time of his arrest. It is also noted that this
particular company, has helped him educationally by funding some of his
college courses while in prison. At this time, he would see himself,
working for this particular company either in billing or in the delivery of
products. Mr. Hart does not see any obstacle from preventing him from
complying with any type of parole conditions that might be levied should
he be paroled.

**HART, DAVID        C-70436      F1-03-131L  GP/rs**

18

**BOARD OF PRISON TERMS REPORT**
**PAGE 4**

Overall, he sees himself as being able to follow the conditions of parole "to the letter". Sees himself living with his family for approximately one year in order to assist him in the transition to civilian life  Mr. Hart's plans appear realistic given the family structure, plans for employment and support he would receive from those in the community.  It further appears that Mr. Hart has the interest and desire to be productive as well as prudent in his use of the money currently in savings.

XII.    **CURRENT MENTAL STATUS/TREATMENT NEEDS:**
Mr. Hart's presentation, made on the above date, was similar to the diagnostic picture presented over the past few years in which there is no severe mental disorder noted.  Mr. Hart presented as a moderately tall, well-groomed, Caucasian male and looked younger than his stated age. He was cooperative, made good eye contact and exhibited no noticeable or atypical behaviors.  His speech was clear and his thoughts were well organized.  His affect was appropriately variable and his mood was euthymic. There was no homicidal or suicidal ideation noted.  He did not experience any type of perceptual disturbances.  He was oriented and expresses appropriate plans upon parole.

**DIAGNOSIS:**
Axis I:   No disorder noted.
Axis II:  No disorder noted.
Axis III: No disorder noted.
Axis IV: Incarceration/Life sentence.
Axis V:  GAF=80.

Throughout the past eighteen plus years while in CDC facilities, Mr. Hart has availed himself of various educational and psycho/educational activities and self-help groups.  It is indeed likely, that he would continue to utilize other programs as they become available to him.  It is this evaluator's opinion that Mr. Hart knows both the path and direction of his life and is committed to being a productive member of society.

XIII.   **REVIEW OF LIFE CRIME:**
Overall, Mr. Hart's report currently does not differ or deviate significantly from that which has previously been reported.  Consequently, there is nothing new to add, that hasn't already been stated.

**HART, DAVID**          **C-70436**      **F1-03-131L  GP/rs**

19

**BOARD OF PRISON TERMS REPORT**
**PAGE 5**

Mr. Hart relates a sense of sadness and remorse for his previous actions. He further has the insight relative to the date of the interview and the anniversary of the victim's demise. He relates feeling "mad" about the grief that he caused the victim's family and his own family. In retrospect, he recognizes "the past doesn't fade away". Overall, the commitment offense never leaves his "consciousness". There has been, for him, more time to think about the pain he caused his victim, the victim's family as well as his previous girlfriend. In short, Mr. Hart relates that he is "more aware" of the impact of his actions on that fateful day.

XIIII. **ASSESSMENT OF DANGEROUSNESS:**
Mr. Hart's potential for violence outside a controlled setting in the past is considered to have been average. At present, if released to the community it is considered to be well below average. There are no significant risk factors or precursors to violence that this writer can foresee at this time.

XV. **CLINICAL OBSERVATION/COMMENTS/RECOMMENDATIONS:**
Over the past four plus years this writer has had the opportunity of meeting Mr. Hart on various occasions primarily centered around the Category T program as well as subsequent Board Reports. This writer can not provide any further observations or recommendations other than those previously reported not only by this writer but also by previous Board Panels that had recommended his release and parole to the community. Mr. Hart continues to remain a stable individual committed to his work, studies and family. Indeed, Mr. Hart's history within CDC's facilities related to his disciplinary record, behavior and work record all attest to his stability and sound decision making skills. It is my professional opinion that his release to the community and parole should be based entirely upon custody issues and not psychological factors.

**GARY PESAVENTO, Ph.D.**
Staff Psychologist

**T: 6/05/00**
**D: 6/06/00**

**HART, DAVID**          **C-70436**      **F1-03-131L  GP/rs**

20

# EXHIBIT D

**BOARD OF PRISON TERMS**                                    **STATE OF CALIFORNIA**
**LIFE PRISONER: PAROLE CONSIDERATION PROPOSED DECISION**
**GRANT PAROLE**

---

**NOTE TO CDC STAFF: Do not release the inmate until after BPT and Governor's review.**

**[ ] PAROLE GRANTED**

If this decision is final, you WILL get a parole date. The Board will send you a copy of the decision. If this decision is changed, you will be told why. The Board may set up another hearing if the decision is changed or taken away.

---

A. Base time in prison.................................................................. _252_ Months

| Case # | Count # | Offense |
|---|---|---|

B. Time for using a weapon............................................... + _24_ Months

C. Time for other crimes.................................................. + _____ Months

| Case # | Count # | Offense | Months |
|---|---|---|---|

| Case # | Count # | Offense | Months |
|---|---|---|---|

| Case # | Count # | Offense | Months |
|---|---|---|---|

D. Total term.................................................................... = _276_ Months

E. Time credit from _8-1-83_ to _8-17-2006_   _88_ Months
         (Life term start date)  (Date of hearing)

F. .................................................................... = _188_ Months

**NOTE:** This is not a final decision. Do not break any rules in California Code of Regulations, Title 15, Section 2451. If you break any rules, your release date may be changed or taken away.

**HEARING PANEL**

| Name | _Terrell c____ | Date | _Aug 16 2006_ |
|---|---|---|---|
| Name | _F. W. Hatch_ | Date | _Aug 17 2006_ |
| Name | | Date | |

| NAME | CDC# | PRISON | DATE |
|---|---|---|---|
| | | | |

BPT 1005(a)(REV. 01/02)                      Distribution: White –C. File
                                    Canary- BPT
                                    Pink- Prisoner

# EXHIBIT E



## OFFICE OF THE GOVERNOR

January 12, 2007

*Via Facsimile and U.S. Mail*

Mr. David Hart, C-70436
*Correctional Training Facility*
CFZWT3-322L
Post Office Box 686
Soledad, California 93960

Dear Mr. Hart:

Penal Code section 3041.2 authorizes the Governor to review parole decisions of the Board of Parole Hearings (Board) concerning persons sentenced to an indeterminate term upon conviction of murder.

After considering the same factors considered by the Board, the Governor has invoked his authority to reverse the Board's decision to grant parole in your case. The Governor's statement of the reasons for his decision is attached.

A copy of this letter is being provided to you via facsimile, and the signed original (along with a statement of the reasons for his decision) is being sent by mail. Additionally, we are transmitting a copy of this letter and the attached decision to the Chairperson of the Board of Parole Hearings.

Sincerely,

ANDREA LYNN HOCH
Legal Affairs Secretary

Attachment

cc: Board of Parole Hearings (w/attachment)

# INDETERMINATE SENTENCE PAROLE RELEASE REVIEW
(Penal Code Section 3041.2)

**DAVID HART C-70436**
**SECOND-DEGREE MURDER**

**AFFIRM:** _____

**MODIFY:** _____

**REVERSE:** _____X_____

On or about June 1, 1982, David Hart shot Michael Imperatrice three times in the back of the head, killing him.

According to the probation report, Mr. Hart was in a dating relationship with Della Castleman for more than a year when she broke up with him and began dating Mr. Imperatrice. Ms. Castleman indicated that Mr. Hart took the breakup hard, telling her that he could not stand to lose her to Mr. Imperatrice.

Then, on June 3, 1982, a California Highway Patrol officer found Mr. Imperatrice's abandoned car near a bridge spanning a canal. There were blood stains in the car and on the bridge. Officers subsequently discovered Mr. Imperatrice's body in the canal, approximately one mile from the bridge. The autopsy revealed he was shot three times in the back of the head and died from the gunshot wounds.

Mr. Hart was arrested more than three months later. He was 22 years old at the time of the murder and, although he admitted to the probation officer that he smoked marijuana occasionally, he had no prior criminal record. Following a jury trial he was convicted of second-degree murder with the use of a firearm. He was sentenced to 15 years to life for murder, plus two consecutive years for the firearm enhancement. The judgment was affirmed on appeal.

During his incarceration for the life offense, Mr. Hart was disciplined one time in 1986 for possession of marijuana. He was also counseled one time in 1986 for obstructing his cell window.

I considered various positive factors in reviewing whether Mr. Hart is suitable for parole at this time. In addition to remaining discipline-free for approximately 20 years, Mr. Hart made efforts in prison to enhance his ability to function within the law upon release. A high school graduate when he entered prison, Mr. Hart subsequently earned his Associate in Arts Degree in Business Administration. He completed vocational training in upholstery work. He held institutional jobs such as canteen worker and sewing machine operator. He participated in an array of self-help and therapy, including Alcoholics Anonymous, Narcotics Anonymous, Life Plan for Recovery, Category T, Category X, Creative Conflict Resolution, Impact, Life Plan for Recovery, Morals and Values, Breaking Barriers, Stress Management, Hands of Peace, Life Skills, and Gavel Club.

In addition, he maintains seemingly solid relationships and close ties with supportive family and friends, and he received favorable evaluations from various correctional and mental-health professionals over the years. He also made plans upon his release to live with his parents in

David Hart, C-70436
Second-Degree Murder
Page 2 of 2

Fresno County, the county of last legal residence, and to work for an irrigation equipment manufacturing business in Fresno.

Despite the positive factors I considered, the second-degree murder for which Mr. Hart was convicted was especially heinous considering the level of premeditation involved. According to the probation report, in addition to telling Ms. Castleman that he could not stand to lose her to Mr. Imperatrice, Mr. Hart also said, "I'll kill him, I'll kill him, he stole you away from me." Similarly, he told his 2002 mental-health evaluator he believed "the only way to get [Ms. Castleman] back was to get [Mr. Imperatrice] to stop seeing her . . . and the only way to do that was through force." On the night of the murder, Mr. Hart drove to Ms. Castleman's house, where he waited until Ms. Castleman and Mr. Imperatrice returned from a weekend getaway. He watched them "making out" for ten to fifteen minutes, until they went inside. According to the probation report, Mr. Hart then hid under a blanket in the back of Mr. Imperatrice's car. He was armed with a gun. Mr. Hart told the 2002 Board he waited for five to ten minutes for Mr. Imperatrice to return. When Mr. Imperatrice returned to the car, Mr. Hart instructed him to drive to an orchard, where he initially shot Mr. Imperatrice twice in the back of the head.

Mr. Hart's actions also demonstrated an exceptionally callous disregard for Mr. Imperatrice's suffering because, according to the probation report, after being shot twice, Mr. Imperatrice reportedly asked Mr. Hart if he was dead. Mr. Hart then shot him a third time in the back of the head. The gravity of the second-degree murder committed by Mr. Hart is alone sufficient for me to conclude presently that his release from prison would pose an unreasonable public-safety risk.

In finding Mr. Hart suitable for parole, the 2006 Board stated, "[y]ou committed the crime as a result of significant stress in your life." The Board did not elaborate on its finding, however, and did not reference any specific facts in support of its conclusion. Regarding the breakup with Ms. Castleman, the author of the 1996 Final Category "X" Board Report remarked, it was "a relatively common and adjustmental problem that most of us face at least once in our lives." Additionally, according to the probation report, at the time of his arrest for Mr. Imperatrice's murder, Mr. Hart was living rent-free with his parents, working full-time as the manager of an ice cream store, and attending Fresno City College. He was also a junior member of the Fort Washington Country Club. In any event, even if Mr. Hart was under stress when he perpetrated the life offense, I believe that factor alone is presently insufficient to mitigate the nature and circumstances of the murder he committed.

At age 46 now, after being incarcerated for approximately 24 years, Mr. Hart made some creditable gains in prison, including accepting responsibility for his actions and expressing remorse. But given the current record before me, and after carefully considering the very same factors the Board must consider, I find that the gravity of the murder perpetrated by Mr. Hart presently outweighs the positive factors. Accordingly, because I believe his release would pose an unreasonable risk of danger to society at this time, I REVERSE the Board's 2006 decision to grant parole to Mr. Hart.

Decision Date: 1/10/2007

ARNOLD SCHWARZENEGGER
Governor, State of California

3

# EXHIBIT F

**Donald Miller**

| | |
|---|---|
| **From:** | Notify@jud.ca.gov |
| **Sent:** | Wednesday, January 23, 2008 10:58 AM |
| **To:** | law@docmil.com |
| **Subject:** | Supreme Court of California Case Notification for: S158386 |

law@docmil.com, the following transaction has occurred in:
HART (DAVID) ON H.C.
Case: S158386, Supreme Court of California

Date (YYYY-MM-DD):        2008-01-23
Event Description:        Petition for review denied
For more information on this case, go to:
http://appellatecases.courtinfo.ca.gov/search/disposition.cfm?dist=0&doc_id=501343
For opinions, go to: http://www.courtinfo.ca.gov/cgi-bin/opinions.cgi?Courts=S

Do not reply to this e-mail. Messages sent to this e-mail address will not be processed.

# EXHIBIT G

# Court of Appeal of the State of California

**IN AND FOR THE**

# Fifth Appellate District

COURT OF APPEAL
FIFTH APPELLATE DISTRICT
F I L E D

NOV 9 - 2007

LEISA V. BIGGERS, CLERK/ADMINISTRATOR
By_____
Deputy

| | |
|---|---|
| In re | F054050 |
| DAVID HART, | ORDER |
| On Habeas Corpus. | |

BY THE COURT*:

The "Petition For Writ Of Habeas Corpus," filed in this court on October 3, 2007, is denied.

_____ Acting P.J.

[Dawson, J., is of the opinion that an order to show cause should issue.]

*Before Vartabedian, Acting P.J., Cornell, J., Dawson, J.

42

# EXHIBIT H

1 | HC07CRWR678296-RHO-rmf

FILED

SEP 24 2007

FRESNO SUPERIOR COURT

By_____
DEPT. 21 - DEPUTY

8        SUPERIOR COURT OF CALIFORNIA, COUNTY OF FRESNO

9                        CENTRAL DIVISION

11 | In re                                      )    No. 07CRWR678296        Dept. 74
                                               )
12 | DAVID HART,                                 )
                                               )    ORDER DENYING WRIT OF
13 |            Petitioner                       )    HABEAS CORPUS
                                               )
14 | On Habeas Corpus.                           )
                                               )

16          Having considered the petition for writ of habeas corpus

17     filed on March 8, 2007, the court finds that existing evidence

18     does not warrant the requested relief.

19          Petitioner challenges the Parole Board's decision to

20     deny his parole.  According to the petition, in 1983 petitioner

21     was convicted of second-degree murder and sentenced to 15 years to

22     life, plus a two-year enhancement for use of a firearm.

23          After previously denying parole eight times, on August

24     17, 2006 the Board of Parole Hearings granted petitioner's parole.

25     (Exhibit A to petition.)  However, on January 12, 2007, the

26     Governor reversed the Board's decision to grant parole.  (Exhibit

27     E to petition.)  The Governor relied primarily on the seriousness

28     of the underlying offense in reaching his decision.  (Ibid.)

COUNTY OF FRESNO
Fresno, CA

1    Whether or not this court agrees with the Board's
2    conclusion, its decision may not be overturned so long as it is
3    supported by "some evidence." (See, e.g., *In re Fuentes* (2005) 135
4    Cal.App.4th 152, *In re Shaputis* (2005) 135 Cal.App.4th 217, *In re*
5    *Lowe* (6th Dist. 2005) 130 Cal.App.4th 1405, *Rosas v. Nielsen* (9th
6    Cir. 2005) 428 F.3d 1229, *In re DeLuna* (2005) 126 Cal.App.4th 585,
7    *In re Scott* (2005) 119 Cal.App.4th 871, *In re Van Houten* (2004)
8    116 Cal.App.4th 339, *Biggs v. Terhune* (9th Cir. 2003) 334 F.3d 910,
9    and *In re Rosenkrantz* (2002) 29 Cal.4th 616.) "This standard of
10   review does not require a review of the entire record, but only
11   requires such review as is necessary to determine whether there is
12   *any* evidence in the record supporting the denial.   [Citation.]
13   Once the factors considered are supported by 'some evidence,' 'the
14   precise manner in which the specified factors relevant to parole
15   suitability are considered and balanced lies within the discretion
16   of the Governor, but the decision must reflect an individualized
17   consideration of the specified criteria and cannot be arbitrary or
18   capricious.   It is irrelevant that a court might determine that
19   evidence in the record tending to establish suitability for parole
20   far outweighs evidence demonstrating unsuitability for parole.'"
21   (*In re Van Houten*, *supra*, 116 Cal.App.4th at 347-348.)

22       Upon considering the record as a whole, the court finds
23   that there was at least "some evidence" to support the Governor's
24   decision to reverse the Board's grant of parole.   "A prisoner's
25   crime constitutes a factor tending to demonstrate unsuitability
26   for parole, where the prisoner committed the offense in an
27   especially heinous, atrocious, or cruel manner. (Cal. Code Regs.,
28   tit. 15, § 2402, subd. (c)(1).)   Under the regulation, among the

COUNTY OF FRESNO
Fresno, CA
HC07CRWR678296

-2-

1   circumstances that support a finding that the prisoner committed
2   the offense in this manner is that 'the offense was carried out in
3   a dispassionate and calculated manner, such as an execution-style
4   murder.' (*Ibid.*)" (*Rosenkrantz, supra*, at 678.)

5           Here, the evidence supports the Governor's conclusion
6   that the petitioner's crime was especially cruel and heinous
7   execution-style murder, and it was committed in a dispassionate
8   and calculated manner.   As the Governor noted, the petitioner
9   stalked his victim, laid in wait for his victim while armed with a
10  gun, then forced the victim to drive to an orchard, where he shot
11  him twice in the head.  When the victim asked if he was dead, the
12  petitioner shot him again.  He then threw the victim's body in a
13  canal.  The premeditated and vicious nature of the crime is some
14  evidence, in itself, to support the Governor's decision to reverse
15  the Board's grant of parole.  Consequently, the court cannot
16  overturn the Governor's decision.

17          The petition is denied.

18          DATED this  24ᵗʰ  day of September, 2007.

19

20

21                          ROBERT H. OLIVER
                            Judge of the Superior Court

22

23

24

25

26

27

28

COUNTY OF FRESNO
Fresno, CA          HC07CRWRG78296
                                    -3-





UNITED STATES POSTAGE

$ 00.00⁰

MAR 17 2008

HENRY BROWN'S

02 1M
0004229613
MAILED FROM ZIP CODE 93960